## *PRELIMINARY PRINT*

## VOLUME 600 U. S. PART 1
### PAGES 1–65

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 27, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# CASES ADJUDGED

IN THE

# SUPREME COURT OF THE UNITED STATES

AT

OCTOBER TERM, 2022

---

MOORE, in his official capacity as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES, et al. *v.* HARPER et al.

CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

No. 21–1271. Argued December 7, 2022—Decided June 27, 2023

The Elections Clause of the Federal Constitution requires "the Legislature" of each State to prescribe the rules governing federal elections. Art. I, §4, cl. 1. This case concerns the claim that the Clause vests state legislatures with authority to set rules governing federal elections free from restrictions imposed under state law. Following the 2020 decennial census, North Carolina's General Assembly drafted a new federal congressional map, which several groups of plaintiffs challenged as an impermissible partisan gerrymander in violation of the North Carolina Constitution. The trial court found partisan gerrymandering claims nonjusticiable under the State Constitution, but the North Carolina Supreme Court reversed. *Harper* v. *Hall*, 380 N. C. 317, 868 S. E. 2d 499 (*Harper I*). While acknowledging that partisan gerrymandering claims are outside the reach of federal courts, see *Rucho* v. *Common Cause*, 588 U. S. ——, ——, the State Supreme Court held that such questions were not beyond the reach of North Carolina courts. The court also rejected the argument that the Federal Elections Clause vests exclusive and independent authority in state legislatures to draw federal congressional maps. The court enjoined the use of the maps and remanded the case to the trial court for remedial proceedings. The legislative defendants then filed an emergency application in this Court, cit-

1

ing the Elections Clause and requesting a stay of the North Carolina Supreme Court's decision.   This Court declined to issue a stay, but later granted certiorari.

   After this Court granted certiorari, the North Carolina Supreme Court issued a decision addressing a remedial map adopted by the trial court.   *Harper* v. *Hall*, 383 N. C. 89, 125, 881 S. E. 2d 156, 181 (*Harper II*).   The North Carolina Supreme Court then granted the legislative defendants' request to rehear that remedial decision in *Harper II*. The court ultimately withdrew the opinion in *Harper II* concerning the remedial maps and overruled *Harper I*, repudiating its holding that partisan gerrymandering claims are justiciable under the North Carolina Constitution.   The court dismissed plaintiffs' claims but did not reinstate the 2021 congressional plans struck down in *Harper I* under the State Constitution.   This Court has entertained two rounds of supplemental briefing on jurisdictional questions in light of the state court's rehearing proceedings.

*Held*:

   1. This Court has jurisdiction to review the judgment of the North Carolina Supreme Court in *Harper I* that adjudicated the Federal Elections Clause issue.   A corollary to this Court's jurisdiction over "Cases" and "Controversies" is that there must exist a dispute "at all stages of review, not merely at the time the complaint is filed."   *Genesis Health-Care Corp.* v. *Symczyk*, 569 U. S. 66, 71 (internal quotation marks omitted).   The North Carolina Supreme Court's decision to withdraw *Harper II* and overrule *Harper I* does not moot this case.   Prior to the appeal and rehearing proceedings in *Harper II*, the court had already entered the judgment and issued the mandate in *Harper I*, and the legislative defendants acknowledged that they would remain bound by *Harper I*'s decision enjoining the use of the 2021 plans.   When the North Carolina Supreme Court "overruled" *Harper I* as part of the rehearing proceedings, it repudiated *Harper I*'s conclusion that partisan gerrymandering claims are justiciable under the North Carolina Constitution.   But the court did not purport to alter or amend the judgment in *Harper I* enjoining the use of the 2021 maps.   Were this Court to reverse *Harper I*, the 2021 plans would again take effect.   Because the legislative defendants' path to complete relief runs through this Court, the parties continue to have a "personal stake in the ultimate disposition of the lawsuit" sufficient to maintain this Court's jurisdiction.   *Chafin* v. *Chafin*, 568 U. S. 165, 172 (internal quotation marks omitted).

   This Court also has jurisdiction to review the judgment in *Harper I* under 28 U. S. C. § 1257(a), which provides that jurisdiction in this Court extends to "[f]inal judgments . . . rendered by the highest court of a

Syllabus

State in which a decision could be had." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, identified categories of cases in which a decision of a State's highest court was considered a final judgment for § 1257(a) purposes despite the anticipation of additional lower court proceedings, including "cases . . . in which the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future statecourt proceedings." *Id.*, at 480. *Harper I* is such a case. Because subsequent proceedings have neither altered *Harper I*'s analysis of the federal issue nor negated the effect of the *Harper I* judgment striking down the 2021 plans, that issue both has survived and requires decision by this Court. Pp. 14–19.

2. The Elections Clause does not vest exclusive and independent authority in state legislatures to set the rules regarding federal elections.

*Marbury* v. *Madison*, 1 Cranch 137, famously proclaimed this Court's authority to invalidate laws that violate the Federal Constitution. But *Marbury* did not invent the concept of judicial review. State courts had already begun to impose restraints on state legislatures, even before the Constitutional Convention, and the practice continued to mature during the founding era. James Madison extolled judicial review as one of the key virtues of a constitutional system, and the concept of judicial review was so entrenched by the time the Court decided *Marbury* that Chief Justice Marshall referred to it as one of society's "fundamental principles." *Id.*, at 177.

The Elections Clause does not carve out an exception to that fundamental principle. When state legislatures prescribe the rules concerning federal elections, they remain subject to the ordinary exercise of state judicial review. Pp. 19–34.

(a) In *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565, this Court examined the Elections Clause's application to a provision of the Ohio Constitution permitting the State's voters to reject, by popular vote, any law enacted by the State's General Assembly. This Court upheld the Ohio Supreme Court's determination that the Federal Elections Clause did not preclude subjecting legislative acts under the Clause to a popular referendum, rejecting the contention that "to include the referendum within state legislative power for the purpose of apportionment is repugnant to § 4 of Article I [the Elections Clause]." *Id.*, at 569. And in *Smiley* v. *Holm*, 285 U. S. 355, this Court considered the effect of a Governor's veto, pursuant to his authority under the State's Constitution, of a congressional redistricting plan. This Court held that the Governor's veto did not violate the Elections Clause, reasoning that a state legislature's "exercise of . . . authority" under the Elections Clause "must be in accordance with the method which the State has

prescribed for legislative enactments." *Id.*, at 367. The Court high-
lighted that the Federal Constitution contained no "provision of an at-
tempt to endow the legislature of the State with power to enact laws in
any manner other than that in which the constitution of the State has
provided that laws shall be enacted." *Id.*, at 368.

This Court recently reinforced the teachings of *Hildebrant* and *Smi-
ley* in *Arizona State Legislature* v. *Arizona Independent Redistricting
Comm'n*, 576 U. S. 787, a case concerning the constitutionality of an
Arizona ballot initiative to amend the State Constitution and to vest
redistricting authority in an independent commission. Significantly for
present purposes, the Court embraced the core principle espoused in
*Hildebrant* and *Smiley*: Whatever authority was responsible for redis-
tricting, that entity remained subject to constraints set forth in the
State Constitution. The Court dismissed the argument that the Elec-
tions Clause divests state constitutions of the power to enforce checks
against the exercise of legislative power.

The basic principle of these cases—reflected in *Smiley*'s unanimous
command that a state legislature may not "create congressional districts
independently of" requirements imposed "by the state constitution with
respect to the enactment of laws," 285 U. S., at 373—commands contin-
ued respect. Pp. 23–26.

(b) The precedents of this Court have long rejected the view that
legislative action under the Elections Clause is purely federal in charac-
ter, governed only by restraints found in the Federal Constitution. The
argument to the contrary does not account for the Framers' understand-
ing that when legislatures make laws, they are bound by the provisions
of the very documents that give them life. Thus, when a state legisla-
ture carries out its federal constitutional power to prescribe rules regu-
lating federal elections, it acts both as a lawmaking body created and
bound by its state constitution, and as the entity assigned particular
authority by the Federal Constitution. Both constitutions restrain the
state legislature's exercise of power.

This Court's decision in *McPherson* v. *Blacker*, 146 U. S. 1, in which
the Court analyzed the Constitution's similarly worded Electors Clause,
is inapposite. That decision did not address any conflict between state
constitutional provisions and state legislatures. Nor does *Leser* v. *Gar-
nett*, 258 U. S. 130, which involved a contested vote by a state legislature
to ratify a federal constitutional amendment, help petitioners. That
case concerned the power of state legislatures to ratify amendments to
the Federal Constitution. But fashioning regulations governing fed-
eral elections "unquestionably calls for the exercise of lawmaking au-
thority." *Arizona State Legislature*, 576 U. S., at 808, n. 17. And the
exercise of such authority in the context of the Elections Clause is sub-

Syllabus

ject to the ordinary constraints on lawmaking in the state constitution. Pp. 26–30.

(c) Petitioners concede that at least some state constitutional provisions can restrain a state legislature's exercise of authority under the Elections Clause, but they read *Smiley* and *Hildebrant* to differentiate between procedural and substantive constraints. But neither case drew such a distinction, and petitioners do not in any event offer a defensible line between procedure and substance in this context. Pp. 30–32.

(d) Historical practice confirms that state legislatures remain bound by state constitutional restraints when exercising authority under the Elections Clause. Two state constitutional provisions adopted shortly after the founding expressly constrained state legislative action under the Elections Clause. See Del. Const., Art. VIII, §2 (1792); Md. Const., Art. XIV (1810). In addition, multiple state constitutions at the time of the founding regulated the "manner" of federal elections by requiring that "elections shall be by ballot." See, *e. g.*, Ga. Const., Art. IV, §2. Moreover, the Articles of Confederation—from which the Framers borrowed—provided that "delegates shall be annually appointed in such manner as the legislature of each state shall direct." Art. V. Around the time the Articles were adopted, multiple States regulated the appointment of delegates, suggesting that the Framers did not understand that language to insulate state legislative action from state constitutional provisions. See, *e. g.*, Del. Const., Art. XI (1776). Pp. 32–34.

3. Although the Elections Clause does not exempt state legislatures from the ordinary constraints imposed by state law, federal courts must not abandon their duty to exercise judicial review. This Court has an obligation to ensure that state court interpretations of state law do not evade federal law. For example, States "may not sidestep the Takings Clause by disavowing traditional property interests." *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 167. While the Court does not adopt a test by which state court interpretations of state law can be measured in cases implicating the Elections Clause, state courts may not transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections.

The Court need not decide whether the North Carolina Supreme Court strayed beyond the limits derived from the Elections Clause, as petitioners did not meaningfully present the issue in this Court. Pp. 34–37.

380 N. C. 317, 868 S. E. 2d 499, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SOTOMAYOR, KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. KAVANAUGH, J., filed a concurring opinion, *post*, p. 38. THOMAS, J., filed a dissenting opinion in which GORSUCH, J., joined, and in which ALITO, J., joined as to Part I, *post*, p. 40.

*David H. Thompson* argued the cause for petitioners. With him on the briefs were *Peter A. Patterson, Brian W. Barnes, John D. Ohlendorf,* and *Megan M. Wold.*

*Neal Kumar Katyal* argued the cause for private respondents. With him on the brief were *Abha Khanna, Lalitha D. Madduri, Jacob D. Shelly, Elisabeth S. Theodore, R. Stanton Jones, Sam Hirsch, Jessica Ring Amunson, Zachary C. Schauf, John R. Wester, Erik R. Zimmerman, Allison J. Riggs, Katherine B. Wellington, William E. Havemann, Leonard R. Powell, Urja Mittal, David J. Bradford, Stephen D. Feldman, Adam K. Doerr, Burton Craige, Narendra K. Ghosh, Hilary H. Klein, Jessica L. Ellsworth, Michael J. West, Tom Boer,* and *Olivia Molodanof.*

*Donald B. Verrilli, Jr.,* argued the cause for state respondents. With him on the brief were *Ryan Y. Park,* Solicitor General of North Carolina, *Sarah G. Boyce, James W. Doggett* and *Nicholas S. Brod,* Deputy Solicitors General, *W. Swain Wood,* First Assistant Attorney General, *South A. Moore, Terence Steed, Mary Carla Babb,* and *Dax Goldstein.*

*Solicitor General Prelogar* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Assistant Attorney General Clarke, Deputy Solicitor General Fletcher, Erica L. Ross,* and *Bonnie I. Robin-Vergeer.\**

———————

*Briefs of *amici curiae* urging reversal were filed for the State of Arkansas et al. by *Leslie Rutledge,* Attorney General of Arkansas, *Nicholas J. Bronni,* Solicitor General, *Dylan L. Jacobs,* Deputy Solicitor General, and *Hannah L. Templin,* Assistant Solicitor General, by *Mark Brnovich,* Attorney General of Arizona, *Joseph A. Kanefield, Brunn W. Roysden III,* Solicitor General, *Michael S. Catlett,* Deputy Solicitor General, and *Kate B. Sawyer,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Derek*

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Several groups of plaintiffs challenged North Carolina's congressional districting map as an impermissible partisan

*Schmidt* of Kansas, *Daniel Cameron* of Kentucky, *Jeff Landry* of Louisiana, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *Douglas J. Peterson* of Nebraska, *John M. O'Connor* of Oklahoma, *Alan Wilson* of South Carolina, *Ken Paxton* of Texas, and *Sean D. Reyes* of Utah; for the American Legislative Exchange Council by *Lee E. Goodman*; for America's Future, Inc., by *William J. Olson, Jeremiah L. Morgan, Robert J. Olson*, and *Patrick McSweeney*; for APA Watch by *Lawrence J. Joseph*; for the Claremont Institute's Center for Constitutional Jurisprudence by *John C. Eastman* and *Anthony T. Caso*; for the Honest Elections Project by *Cameron T. Norris* and *Thomas R. McCarthy*; for the Lawyers Democracy Fund et al. by *David B. Rivkin, Jr., E. Mark Braden*, and *Andrew M. Grossman*; for the Republican National Committee et al. by *Jason B. Torchinsky, Edward M. Wenger*, and *Andrew D. Watkins*; for Restoring Integrity and Trust in Elections, Inc., by *John M. Gore* and *Eric Tung*; for Taxpayers for Honest Elections by *David Stevenson Walker II* and *Philip R. Thomas*; for John R. Ashcroft by *Jesus A. Osete*; and for Kim Ward et al. by *Anthony R. Holtzman*.  Briefs of *amici curiae* urging vacatur were filed for the America First Legal Foundation by *Jonathan F. Mitchell, Adam K. Mortara*, and *Gene P. Hamilton*; for Citizens United et al. by *Gary M. Lawkowski, Michael Boos*, and *Daniel H. Jorjani*; for the National Republican Redistricting Trust by *Phillip M. Gordon*; and for the Public Interest Legal Foundation by *J. Christian Adams*.

Briefs of *amici curiae* urging affirmance were filed for the District of Columbia et al. by *Karl A. Racine*, Attorney General of the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Adam J. Tuetken* and *Arjun P. Ogale*, Assistant Attorneys General, by *Kwame Raoul*, Attorney General of Illinois, *Jane Elinor Notz*, Solicitor General, and *Alex Hemmer*, Deputy Solicitor General, and by the Attorneys General for their respective States as follows: *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Holly T. Shikada* of Hawaii, *Aaron M. Frey* of Maine, *Brian E. Frosh* of Maryland, *Maura Healey* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Hector Balderas* of New Mexico, *Letitia James* of New York, *Ellen F. Rosenblum* of Oregon, *Josh Shapiro* of Pennsylvania, *Peter F. Neronha* of Rhode Island, *Susanne R. Young* of Vermont, *Robert W. Ferguson* of

gerrymander. The plaintiffs brought claims under North
Carolina's Constitution, which provides that "[a]ll elections
shall be free." Art. I, §10. Relying on that provision, as
well as the State Constitution's equal protection, free speech,

Washington, and *Joshua L. Kaul* of Wisconsin; for the American Bar Asso-
ciation by *Faith Gay, Caitlin J. Halligan,* and *Deborah Enix-Ross*; for the
American Civil Liberties Union et al. by *Ari Savitzky, Adriel I. Cepeda
Derieux, Sophia Lin Lakin, Dale E. Ho, John W. Whitehead, David Book-
binder, Kristi L. Graunke,* and *David D. Cole*; for the Bipartisan Group
of Former Public Officials et al. by *Mary B. McCord, Rupa Bhatta-
charyya,* and *Kelsi Brown Corkran*; for the Brennan Center for Justice at
NYU School of Law by *Ellyde R. Thompson, Sascha N. Rand, Andrew J.
Rossman, Wendy R. Weiser, Thomas P. Wolf, Eliza M. Sweren-Becker,*
and *Kelly M. Percival*; for the Constitutional Accountability Center by
*Elizabeth B. Wydra, Brianne J. Gorod,* and *David Gans*; for Current Elec-
tion Administrators et al. by *Karl J. Sandstrom, Charles G. Curtis, Jr.,*
and *Kevin J. Hamilton*; for Democracy and Race Scholars by *T. Alora
Thomas-Lundborg, Angela M. Liu,* and *Gregory P. Luib*; for FairDistricts
Now by *Gregory L. Diskant* and *Jonah M. Knobler*; for Former Republi-
can Officials et al. by *Charles A. Rothfeld, Andrew J. Pincus, Paul W.
Hughes, Michael B. Kimberly,* and *Eugene R. Fidell*; for Law Forward
et al. by *Mel Barnes, Daniel S. Lenz, Jeffrey A. Mandell,* and *Douglas M.
Poland*; for the League of Women Voters of the United States et al. by
*Jon Sherman, Michelle Kanter Cohen, Meaghan VerGow, L. Nicole Allan,*
and *Caren E. Short*; for Local Government Law Professors by *Joshua A.
Rosenthal* and *Jonathan B. Miller*; for Making Every Vote Count et al.
by *Robert A. Long, Jr.* and *Jonathan D. Blake*; for the National Associa-
tion of Counties et al. by *John J. Korzen*; for Public Citizen by *Scott L.
Nelson* and *Allison M. Zieve*; for Retired Four-Star Admirals et al. by
*Ilana H. Eisenstein*; for Scholars of State Constitutional Law by *Christo-
pher J. Cariello, Melanie R. Hallums,* and *Robert Yablon*; for Scholars of
the Founding Era by *Robert A. Atkins, Walter Rieman,* and *Jonathan H.
Hurwitz*; for State Constitutional Historians et al. by *Michael J. Gottlieb*
and *Aaron E. Nathan*; for Akhil Reed Amar et al. by *Vikram David
Amar, pro se*; for Evan Bernick by *Anton Metlitsky*; for Daniel T. Blue,
Jr., et al. by *Seth P. Waxman, Daniel S. Volchok, Andres C. Salinas,* and
*Debo P. Adegbile*; for Benjamin L. Ginsberg by *Marcos Daniel Jiménez*;
for Thomas Griffith et al. by *Richard D. Bernstein*; for Sen. Amy Klobu-
char et al. by *David A. O'Neil*; for Derek T. Muller by *Daniel M. Sullivan*;
for Charles Plambeck et al. by *H. David Rosenbloom*; for Michael L. Rosin
by *Peter K. Stris* and *Michael N. Donofrio*; for Arnold Schwarzenegger

and free assembly clauses, the North Carolina Supreme Court found in favor of the plaintiffs and struck down the legislature's map. The Court concluded that North Carolina's Legislature deliberately drew the State's congressional map to favor Republican candidates.

In drawing the State's congressional map, North Carolina's Legislature exercised authority under the Elections Clause of the Federal Constitution, which expressly requires "the Legislature" of each State to prescribe "[t]he Times, Places and Manner of" federal elections. Art. I, §4, cl. 1. We decide today whether that Clause vests state legislatures

by *David C. Frederick*; for Stephen M. Shapiro by *Mr. Shapiro, pro se*; for William M. Treanor by *Brian A. Sutherland*; and for Sen. Sheldon Whitehouse et al. by *Gerson H. Smoger*.

Briefs of *amici curiae* were filed for the Anti-Defamation League et al. by *John B. Harris, Steven M. Freeman*, and *Karen Levit*; for the Arizona Independent Redistricting Commission by *Brett W. Johnson, Eric H. Spencer,* and *Tracy A. Olson*; for Bipartisan Current Election Officials et al. by *Mark A. Packman*; for the Boston University Center for Antiracist Research et al. by *Rebecca MacDowell Lecaroz*; for the Campaign Legal Center et al. by *Paul M. Smith, Adav Noti*, and *Kevin P. Hancock*; for the Conference of Chief Justices by *Carter G. Phillips, Virginia A. Seitz, Kathleen M. Mueller*, and *Evan Caminker*; for the Group of New York Voters by *Misha Tseytlin*; for Human Rights Watch by *Rishi N. Zutshi*; for the Lawyers' Committee for Civil Rights Under Law et al. by *Damon T. Hewitt, Jon M. Greenbaum, Ezra D. Rosenberg, Antony L. Ryan, Helam Gebremariam, David H. Korn*, and *Evan Norris*; for Lawyers Defending American Democracy by *Gershon M. Ratner*; for the NAACP Legal Defense & Educational Fund, Inc., by *Janai Nelson, Samuel Spital*, and *Stuart Naifeh*; for the Puerto Rico House of Representatives by *Emil Rodríguez-Escudero* and *Jorge Martínez-Luciano*; for the Secretaries of the State of Colorado et al. by *Philip J. Weiser*, Attorney General of Colorado, *Eric R. Olson*, Solicitor General, and *Michael Kotlarczyk*, Senior Assistant Attorney General; for White House Watch by *David W. T. Carroll*; for the Wisconsin Voter Alliance et al. by *Erick G. Kaardal*; for Women4Change Indiana, Inc., by *Harmony A. Mappes, Stephanie L. Gutwein, Jeffrey P. Justman*, and *Joseph H. Yeager, Jr.*; for Eugene H. Goldberg by *Mr. Goldberg, pro se*; for Richard L. Hasen by *Mr. Hasen, pro se*; and for Carolyn Shapiro et al. by *Theresa J. Lee* and *Ruth Greenwood*.

with authority to set rules governing federal elections free
from restrictions imposed under state law.

## I

The Elections Clause provides: "The Times, Places and
Manner of holding Elections for Senators and Representa-
tives, shall be prescribed in each State by the Legislature
thereof; but the Congress may at any time by Law make or
alter such Regulations, except as to the Places of chusing
Senators." *Ibid.* The Clause "imposes" on state legisla-
tures the "duty" to prescribe rules governing federal elec-
tions. *Arizona* v. *Inter Tribal Council of Ariz., Inc.,* 570
U. S. 1, 8 (2013). It also guards "against the possibility that
a State would refuse to provide for the election of repre-
sentatives" by authorizing Congress to prescribe its own
rules. *Ibid.*

## A

The 2020 decennial census showed that North Carolina's
population had increased by nearly one million people, en-
titling the State to an additional seat in its federal con-
gressional delegation. U. S. Census Bureau, 2020 Census
Apportionment Results (2021) (Table A). Following those
results, North Carolina's General Assembly set out to re-
draw the State's congressional districts. *North Carolina
League of Conservation Voters, Inc.* v. *Representative Des-
tin Hall,* 21 CVS 015426 etc. (Super. Ct. Wake Cty., N. C.,
Dec. 3, 2021), App. to Pet. for Cert. 260a–261a, rev'd and
remanded on other grounds, *Harper* v. *Hall,* 380 N. C. 317,
868 S. E. 2d 499 (2022) (*Harper I*). The General Assembly
also drafted new maps for the State's legislative districts,
including the State House and the State Senate. *Id.,* at 328–
329, 868 S. E. 2d, at 513. In November 2021, the Assembly
enacted three new maps, each passed along party lines. *Id.,*
at 329, 868 S. E. 2d, at 513; see N. C. Gen. Stat. Ann. §120–1
(2021) (State Senate); §120–2 (State House); §163–201 (U. S.
House of Representatives).

Shortly after the new maps became law, several groups of plaintiffs—including the North Carolina League of Conservation Voters, Common Cause, and individual voters—sued in state court. The plaintiffs asserted that each map constituted an impermissible partisan gerrymander in violation of the North Carolina Constitution. *Harper I*, 380 N. C., at 329–330, 868 S. E. 2d, at 513–514.[1] At trial before a three-judge panel of the Wake County Superior Court, the plaintiffs presented expert testimony and other evidence to support their claims that North Carolina's General Assembly drew state legislative and federal congressional maps to favor Republican candidates. *Id.*, at 332, 868 S. E. 2d, at 515. The trial court agreed, finding that the General Assembly's 2021 congressional districting map was "a partisan outlier intentionally and carefully designed to maximize Republican advantage in North Carolina's Congressional delegation." *Id.*, at 345, 868 S. E. 2d, at 522 (internal quotation marks omitted). But the court denied relief, reasoning that the partisan gerrymandering claims "amounted to political questions that are nonjusticiable under the North Carolina Constitution." *Id.*, at 348, 868 S. E. 2d, at 524.

The North Carolina Supreme Court reversed, holding that the legislative defendants violated state law "beyond a reasonable doubt" by enacting maps that constituted partisan gerrymanders. *Id.*, at 353, 868 S. E. 2d, at 528. It also rejected the trial court's conclusion that partisan gerrymandering claims present a nonjusticiable political question. *Ibid.* The Court acknowledged our decision in *Rucho* v. *Common Cause*, which held "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." 588 U. S. ——, —— (2019); see *Harper I*, 380 N. C., at 360–361, 868 S. E. 2d, at 532–533. But "simply because

----

[1] The plaintiffs also asserted that North Carolina's Legislature discriminated on the basis of race and raised other claims under the North Carolina Constitution. *Harper I*, 380 N. C., at 350–352, 868 S. E. 2d, at 526–527. Those claims are not at issue today.

the Supreme Court has concluded partisan gerrymandering claims are nonjusticiable in federal courts," the court explained, "it does not follow that they are nonjusticiable in North Carolina courts." *Id.*, at 361, 868 S. E. 2d, at 533. The State Supreme Court also rejected the argument that the Elections Clause in the Federal Constitution vests exclusive and independent authority in state legislatures to draw congressional maps. *Id.*, at 390–391, 868 S. E. 2d, at 551–552.

After holding that the 2021 districting maps "substantially infringe upon plaintiffs' fundamental right to equal voting power," the Court struck down the maps and remanded the case to the trial "court to oversee the redrawing of the maps by the General Assembly or, if necessary, by the court." *Id.*, at 403, 868 S. E. 2d, at 559. The Court entered judgment on February 15, 2022. *Harper* v. *Hall*, No. 413PA21, App. to Pet. for Cert. 306–309. Two days later, the General Assembly adopted a remedial congressional redistricting plan. See 2022 N. C. Sess. Laws 3, p. 10, §2. But the trial court rejected that plan and adopted in its place interim maps developed by several Special Masters for use in the 2022 North Carolina congressional elections. *North Carolina League of Conservation Voters, Inc.* v. *Representative Destin Hall*, 21 CVS 015426 etc. (Super. Ct. Wake Cty., N. C., Feb. 23, 2022), App. to Pet. for Cert. 278a–279a, aff'd in part, rev'd in part, and remanded, *Harper* v. *Hall*, 383 N. C. 89, 881 S. E. 2d 156 (2022) (*Harper II*).

On February 25, 2022, the legislative defendants filed an emergency application in this Court, citing the Elections Clause and requesting a stay of the North Carolina Supreme Court's decision. We declined to issue emergency relief but later granted certiorari. 597 U. S. —— (2022).

B

Following our grant of certiorari, the North Carolina Supreme Court heard an appeal concerning the trial court's re-

medial order. In December 2022, the Court issued a decision affirming in part, reversing in part, and remanding the case. As relevant, it agreed with the trial court's determination that the General Assembly's remedial congressional plan "fell short" of the requirements set forth in *Harper I*. *Harper II*, 383 N. C., at 125, 881 S. E. 2d, at 181.

The legislative defendants sought rehearing, requesting that the North Carolina Supreme Court "withdraw" its remedial opinion in *Harper II*. Pet. for Rehearing in *Harper* v. *Hall*, No. 413PA21, p. 25 (Jan. 20, 2023) (Pet. for Rehearing). They also asked the Court to "overrule" its decision in *Harper I*, although they conceded that doing so would not "negate the force of its order striking down the 2021 plans." Pet. for Rehearing 24. The North Carolina Supreme Court granted rehearing in *Harper II*, and we ordered the parties to submit supplemental briefing concerning our jurisdiction over this case in light of that decision.

Following the parties' submission of supplemental briefs in this Court, the North Carolina Supreme Court issued a decision granting the requests made by the legislative defendants. The Court withdrew its opinion in *Harper II*, concerning the remedial maps, and "overruled" its decision in *Harper I*. See *Harper* v. *Hall*, 384 N. C. 292, 886 S. E. 2d 393 (2023). Relying on our decision in *Rucho* and on a renewed look at the constitutional provisions at issue, the Court repudiated *Harper I*'s conclusion that partisan gerrymandering claims are justiciable under the North Carolina Constitution. See 384 N. C., at 349–350, 886 S. E. 2d, at 431.

The North Carolina Supreme Court dismissed the plaintiffs' claims with prejudice. *Id.*, at 301, 886 S. E. 2d, at 401. But it did not reinstate the 2021 congressional plans that *Harper I* had struck down under the North Carolina Constitution. 384 N. C., at 374–378, 886 S. E. 2d, at 446–448. Instead, the Court provided the General Assembly with the "opportunity to enact a new set of legislative and congressional redistricting plans, guided by federal law, the objective con-

straints in Article II, Sections 3 and 5 [of the North Carolina Constitution], and this opinion." *Id.*, at 378, 886 S. E. 2d, at 448. The Court did not revisit *Harper I*'s conclusion that the Federal Elections Clause does not shield state legislatures from review by state courts for compliance with state constitutional provisions. 384 N. C., at 336, 886 S. E. 2d, at 422 ("The General Assembly exercises [redistricting] authority subject to the express limitations in our constitution and in federal law."). We invited the parties to submit additional supplemental briefs addressing the effect of the Court's decision on our jurisdiction.

## II

Before turning to the merits, we must "determine as a threshold matter that we have jurisdiction." *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 178 (1988). The Constitution provides for our jurisdiction over "Cases" and "Controversies." Art. III, § 2. That constitutional requirement ensures that the parties before us retain a "personal stake" in the litigation. *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). As "[a] corollary to this case-or-controversy requirement," there must exist a dispute "at all stages of review, not merely at the time the complaint is filed." *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. 66, 71 (2013) (internal quotation marks omitted). Mootness doctrine "addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia* v. *EPA*, 597 U. S. ——, —— (2022) (alterations and internal quotation marks omitted).

The North Carolina Supreme Court's decision to withdraw *Harper II* and overrule *Harper I* does not moot this case. The plaintiffs here sought to enjoin the use of the 2021 plans enacted by the legislative defendants. *Harper I* granted that relief, and in doing so rejected the Elections Clause defense at issue before us. 380 N. C., at 403, 868 S. E. 2d, at

559. Prior to both the appeal and rehearing proceedings in *Harper II*, the North Carolina Supreme Court had already entered the judgment and issued the mandate in *Harper I*. See App. to Pet. for Cert. 306–309. And the time during which the defendants could seek rehearing as to that judgment had long since passed. See N. C. Rule App. Proc. 31(a) (2023) (requiring that a rehearing petition be brought within 15 days of the issuance of the mandate). Recognizing this reality, the legislative defendants did not ask the North Carolina Supreme Court to disturb the judgment in *Harper I* as part of the rehearing proceedings. They instead acknowledged that they would remain bound by *Harper I*'s decision enjoining the use of the 2021 plans. See Pet. for Rehearing 24 ("[O]verruling *Harper I* will not negate the force of its order striking down the 2021 plans.").

The North Carolina Supreme Court "overruled" *Harper I*, thereby granting the specific relief requested by the legislative defendants. As a result, partisan gerrymandering claims are no longer justiciable under the State's Constitution. *Harper*, 384 N. C., at 378–379, 886 S. E. 2d, at 449. But although the defendants may now draw new congressional maps, they agree that the North Carolina Supreme Court overruled only the "*reasoning* of *Harper I*" and did not "disturb . . . its judgment nor . . . alter the presently operative statutes of North Carolina." Second Supp. Letter Brief for Petitioners 3. In other words, although partisan gerrymandering claims are no longer viable under the North Carolina Constitution, the North Carolina Supreme Court has done nothing to alter the effect of the judgment in *Harper I* enjoining the use of the 2021 maps. As a result, the legislative defendants' path to complete relief runs through this Court. Were we to reverse the judgment in *Harper I*—a step not taken by the North Carolina Supreme Court—the 2021 plans enacted by the legislative defendants would again take effect. The parties accordingly continue to have a "personal

stake in the ultimate disposition of the lawsuit." *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (internal quotation marks omitted).

A North Carolina statute with specific application to this proceeding confirms that the controversy before us remains live. Under state law, if "the United States Supreme Court . . . reverses" the decision in *Harper I*, the 2021 maps will again become "effective." 2022 N. C. Sess. Laws 3, p. 10, § 2. We have previously found such trigger provisions—in North Carolina, no less—sufficient to avoid mootness under Article III. See *Hunt* v. *Cromartie*, 526 U. S. 541, 546, n. 1 (1999) ("Because the State's 1998 law provides that the State will revert to the 1997 districting plan upon a favorable decision of this Court . . . this case is not moot.").

We also have jurisdiction to review the judgment in *Harper I* under 28 U. S. C. § 1257(a). That statute provides for this Court's exercise of jurisdiction over "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." *Ibid.* We have, however, "recurringly encountered situations in which the highest court of a State has finally determined the federal issue present in a particular case, but in which there are further proceedings in the lower state courts to come." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975).

*Cox Broadcasting* delineated "at least four categories of such cases in which the Court has treated the decision on the federal issue as a final judgment for the purposes of 28 U. S. C. § 1257," despite "additional proceedings anticipated in the lower state courts." *Ibid.* As relevant, the second category includes those "cases . . . in which the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future statecourt proceedings." *Id.*, at 480.

*Harper I* fits within this second category of cases described in *Cox Broadcasting*. By striking down the 2021 congressional plans enacted by the General Assembly,

*Harper I* "finally decided" the "federal issue" whether the Elections Clause insulates state legislatures from review by state courts for compliance with state law. See 380 N. C., at 390–391, 868 S. E. 2d, at 551–552. That issue both has survived and requires decision because subsequent proceedings have neither altered *Harper I*'s analysis of the federal issue nor negated the effect of its judgment striking down the 2021 plans. In its decision "overruling" *Harper I*, the North Carolina Supreme Court in fact reaffirmed that it retains the authority to review congressional districting plans for compliance with state law. *Harper*, 384 N. C., at 336, 886 S. E. 2d, at 422.

That the North Carolina Supreme Court overruled *Harper I* does not affect the judgment in that case for purposes of § 1257(a). "[T]he res judicata consequences of a final, unappealed judgment on the merits" are not "altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 398 (1981). The North Carolina Supreme Court has said much the same. *East Carolina Lumber Co.* v. *West*, 247 N. C. 699, 701, 102 S. E. 2d, 248, 249 (1958) ("An erroneous or irregular judgment binds the parties thereto until corrected in a proper manner."). That Court did not purport to alter or amend in any way the judgment in *Harper I*. In short, the record before us shows that *Harper I* "finally decided" the Elections Clause issue, which has survived subsequent proceedings in the North Carolina Supreme Court such that it continues to "require decision" by this Court. *Cox Broadcasting*, 420 U. S., at 480.

JUSTICE THOMAS sees it differently. He correctly observes that the North Carolina Supreme Court has now dismissed the plaintiffs' claims with prejudice. He posits, therefore, that the legislative defendants "are not injured by the judgment of *Harper I*." *Post*, at 45 (dissenting opinion). But the record before us belies that notion. *Harper I* en-

joined the use of the 2021 maps in subsequent elections in
North Carolina. Well after the time for seeking rehearing
as to that judgment passed, the legislative defendants in-
stead sought rehearing with respect to *Harper II*, a distinct
decision concerning remedies. The defendants steadfastly
maintained in rehearing proceedings before the North Caro-
lina Supreme Court that "overruling *Harper I* [would] not
negate the force of its order striking down the 2021 plans."
Pet. for Rehearing 24; see also Legislative Defendants' Supp.
Brief on Rehearing in *Harper* v. *Hall*, No. 413PA21–2, p. 56
(N. C., Feb. 17, 2023) ("[T]he Court's dictate that the 2021
plans may not be used 'in any future elections' would not be
vacated."). With those concessions on the record, the North
Carolina Supreme Court issued its decision "overruling"
*Harper I*, and—by contrast—"withdraw[ing]" its decision in
*Harper II*. *Harper*, 384 N. C., at 379, 886 S. E. 2d, at 449.
And mirroring their representations before the North Caro-
lina Supreme Court, the legislative defendants now maintain
in this Court that they continue to remain bound by the judg-
ment in *Harper I*.

In an effort to cast doubt on these consistent representa-
tions by the injured party before us, JUSTICE THOMAS con-
tends that the legislative defendants have already received
complete relief because nothing now prevents the implemen-
tation of the 2021 maps. *Post*, at 54 (dissenting opinion).
For the reasons stated above, that would come as a surprise
to both the legislative defendants and the North Carolina
Supreme Court. The dissent also emphasizes that several
of the plaintiffs contest our jurisdiction. *Post*, at 45. But
that has been their position from the very beginning, and
it did not prevent our granting certiorari. The concessions
offered by the legislative defendants as part of the rehearing
proceedings, the recent opinion issued by the North Carolina
Supreme Court, and the legislative defendants' briefing in
this Court all tell the same story: *Harper I* continues to en-
join the use of the 2021 maps. Following the dissent's logic

and dismissing this case as moot would foreclose the one path to full relief available to the legislative defendants: A decision by this Court reversing the judgment in *Harper I.*

This Court has before it a judgment issued by a State's highest court that adjudicates a federal constitutional issue. The defendants did not ask the North Carolina Supreme Court to vacate that judgment, that court did not purport to do so, and the defendants now concede that they remain bound by it. *Cox Broadcasting* considered our exercise of jurisdiction where the "federal issue . . . will survive and require decision regardless of the outcome of future state-court proceedings." 420 U. S., at 480. Unlike cases in which we must anticipate what the future might hold, we now know the resolution of the anticipated state court proceedings. The record shows that *Harper I* finally decided the Elections Clause question, the judgment in that case continues to bind the parties before us, and the 2021 congressional maps would again take effect in North Carolina were we to reverse. Accordingly, we have jurisdiction under both Article III and § 1257(a).

## III

The question on the merits is whether the Elections Clause insulates state legislatures from review by state courts for compliance with state law.

Since early in our Nation's history, courts have recognized their duty to evaluate the constitutionality of legislative acts. We announced our responsibility to review laws that are alleged to violate the Federal Constitution in *Marbury* v. *Madison*, proclaiming that "[i]t is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177 (1803). *Marbury* confronted and rejected the argument that Congress may exceed constitutional limits on the exercise of its authority. "Certainly all those who have framed written constitutions," we reasoned, "contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such gov-

ernment must be, that an act of the legislature, repugnant
to the constitution, is void." *Ibid.*

*Marbury* proclaimed our authority to invalidate laws that
violate the Federal Constitution, but it did not fashion this
concept out of whole cloth. Before the Constitutional Con-
vention convened in the summer of 1787, a number of state
courts had already moved "in isolated but important cases
to impose restraints on what the legislatures were enacting
as law." G. Wood, The Creation of the American Republic
1776–1787, pp. 454–455 (1969). Although judicial review
emerged cautiously, it matured throughout the founding era.
These state court decisions provided a model for James Mad-
ison, Alexander Hamilton, and others who would later defend
the principle of judicial review.

In the 1786 case *Trevett* v. *Weeden*, for example, lawyer
James Varnum challenged a Rhode Island statute on the
ground that it failed to provide the right to a jury trial. Al-
though Rhode Island lacked a written constitution, Varnum
argued that the State nevertheless had a constitution re-
flecting the basic historical rights of the English. And, he
contended, the courts must honor "the principles of the con-
stitution in preference to any acts of the General Assembly."
J. Varnum, *The Case*, Trevett *v.* Weeden, reprinted in 1 B.
Schwartz, The Bill of Rights: A Documentary History 424
(1971). Varnum won, to the dismay of the State's legisla-
ture, which replaced four of the five judges involved. W.
Treanor, Judicial Review Before *Marbury*, 58 Stan. L. Rev.
455, 478 (2005). His arguments were published as a pam-
phlet, which "may well have been the most prominent discus-
sion of judicial review at the time of the Philadelphia Consti-
tutional Convention." *Id.*, at 477.

The North Carolina Supreme Court played its own part in
establishing judicial review. In *Bayard* v. *Singleton*, the
court considered the constitutionality of a 1785 Act by the
State's General Assembly that prevented British loyalists

from challenging property seizures before a jury. 1 Mart. 48 (1787). The court held the Act "abrogated and without any effect," for "it was clear" that the legislature could not pass an Act that "could by any means repeal or alter the constitution." *Id.*, at 50. Otherwise, the legislature "would at the same instant of time, destroy their own existence as a Legislature, and dissolve the government thereby established." *Ibid.* James Iredell, who would later serve as an inaugural Justice of this Court, penned at the time an open letter "To the Public" expounding a robust concept of judicial review. 2 Life and Correspondence of James Iredell 145 (1846). "[T]he power of the Assembly," he wrote, "is limited and defined by the constitution." *Id.*, at 146. The legislature, after all, "is a *creature* of the constitution." *Ibid.*

North Carolina and Rhode Island did not stand alone. See, *e. g.*, *Holmes* v. *Walton* (N. J. 1780), described in A. Scott, *Holmes* vs. *Walton*: The New Jersey Precedent, 4 Am. Hist. Rev. 456 (1899); *State* v. *Parkhurst*, 9 N. J. L. 427, 444 (1802) (citing *Holmes* as holding that a statute providing for a six-person jury was "unconstitutional"). All told, "[s]tate courts in at least seven states invalidated state or local laws under their State constitutions before 1787," which "laid the foundation for judicial review." J. Sutton, 51 Imperfect Solutions 13 (2018).

The Framers recognized state decisions exercising judicial review at the Constitutional Convention of 1787. On July 17, James Madison spoke in favor of a federal council of revision that could negate laws passed by the States. He lauded the Rhode Island judges "who refused to execute an unconstitutional law," lamenting that the State's legislature then "displaced" them to substitute others "who would be willing instruments of the wicked & arbitrary plans of their masters." 2 Records of the Federal Convention of 1787, p. 28 (M. Farrand ed. 1911). A week later, Madison extolled as one of the key virtues of a constitutional system that "[a]

law violating a constitution established by the people themselves, would be considered by the Judges as null & void." *Id.*, at 93. Elbridge Gerry, a delegate from Massachusetts, also spoke in favor of judicial review. (Known for drawing a contorted legislative district that looked like a salamander, Gerry later became the namesake for the "gerrymander.") At the Convention, he noted that "[i]n some States the Judges had [actually] set aside laws as being agst. the Constitution." 1 *id.*, at 97 (alteration in original by James Madison). Such judicial review, he noted, was met "with general approbation." *Ibid.*

Writings in defense of the proposed Constitution echoed these comments. In the Federalist Papers, Alexander Hamilton maintained that "courts of justice" have the "duty . . . to declare all acts contrary to the manifest tenor of the Constitution void." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961). "[T]his doctrine" of judicial review, he also wrote, was "equally applicable to most if not all the State governments." *Id.*, No. 81, at 482.

State cases, debates at the Convention, and writings defending the Constitution all advanced the concept of judicial review. And in the years immediately following ratification, courts grew assured of their power to void laws incompatible with constitutional provisions. See Treanor, 58 Stan. L. Rev., at 473, 497–498. The idea that courts may review legislative action was so "long and well established" by the time we decided *Marbury* in 1803 that Chief Justice Marshall referred to judicial review as "one of the fundamental principles of our society." 1 Cranch, at 176–177.

## IV

We are asked to decide whether the Elections Clause carves out an exception to this basic principle. We hold that it does not. The Elections Clause does not insulate state legislatures from the ordinary exercise of state judicial review.

A

We first considered the interplay between state constitutional provisions and a state legislature's exercise of authority under the Elections Clause in *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565 (1916). There, we examined the application to the Elections Clause of a provision of the Ohio Constitution permitting the State's voters "to approve or disapprove by popular vote any law enacted by the General Assembly." *Id.*, at 566. In 1915, the Ohio General Assembly drew new congressional districts, which the State's voters then rejected through such a popular referendum. Asked to disregard the referendum, the Ohio Supreme Court refused, explaining that the Elections Clause—while "conferring the power therein defined upon the various state legislatures"—did not preclude subjecting legislative Acts under the Clause to "a popular vote." *State ex rel. Davis* v. *Hildebrant*, 94 Ohio St. 154, 163, 114 N. E. 55, 58 (1916).

We unanimously affirmed, rejecting as "plainly without substance" the contention that "to include the referendum within state legislative power for the purpose of apportionment is repugnant to §4 of Article I [the Elections Clause]." *Hildebrant*, 241 U. S., at 569; see also *Hawke* v. *Smith*, 253 U. S. 221, 230–231 (1920) (describing *Hildebrant* as holding that "the referendum provision of the state constitution when applied to a law redistricting the State with a view to representation in Congress was not unconstitutional").

*Smiley* v. *Holm*, decided 16 years after *Hildebrant*, considered the effect of a Governor's veto of a state redistricting plan. 285 U. S. 355, 361 (1932). Following the 15th decennial census in 1930, Minnesota lost one seat in its federal congressional delegation. The State's legislature divided Minnesota's then nine congressional districts in 1931 and sent its Act to the Governor for his approval. The Governor vetoed the plan pursuant to his authority under the State's Constitution. But the Minnesota Secretary of State nevertheless began to implement the legislature's map for upcom-

ing elections. A citizen sued, contending that the legislature's map "was a nullity in that, after the Governor's veto, it was not repassed by the legislature as required by law." *Id.*, at 362. The Minnesota Supreme Court disagreed. In its view, "the authority so given by" the Elections Clause "is unrestricted, unlimited, and absolute." *State ex rel. Smiley* v. *Holm*, 184 Minn. 228, 242, 238 N. W. 494, 501 (1931). The Elections Clause, it held, conferred upon the legislature "the exclusive right to redistrict" such that its actions were "beyond the reach of the judiciary." *Id.*, at 243, 238 N. W., at 501.

We unanimously reversed. A state legislature's "exercise of . . . authority" under the Elections Clause, we held, "must be in accordance with the method which the State has prescribed for legislative enactments." *Smiley*, 285 U. S., at 367. Nowhere in the Federal Constitution could we find "provision of an attempt to endow the legislature of the State with power to enact laws in any manner other than that in which the constitution of the State has provided that laws shall be enacted." *Id.*, at 368.

*Smiley* relied on founding-era provisions, constitutional structure, and historical practice, each of which we found persuasive. Two States at the time of the founding provided a veto power, restrictions that were "well known." *Ibid.* (citing provisions in Massachusetts and New York). Subjecting state legislatures to such a limitation "was no more incongruous with the grant of legislative authority to regulate congressional elections than the fact that the Congress in making its regulations under the same provision would be subject to the veto power of the President." *Ibid.*; see also *Wesberry* v. *Sanders*, 376 U. S. 1, 6 (1964) (Congress does not have "exclusive authority" under the Elections Clause, independent of other federal constitutional provisions). And "long and continuous interpretation" as evidenced by "the established practice in the states" provided further support. *Smiley*, 285 U. S., at 369. We noted that

many state constitutions had adopted provisions allowing for executive vetoes, "and that the uniform practice . . . has been to provide for congressional districts by the enactment of statutes with the participation of the Governor wherever the state constitution provided for such participation." *Id.*, at 370.

This Court recently reinforced the teachings of *Hildebrant* and *Smiley* in a case considering the constitutionality of an Arizona ballot initiative. Voters "amended Arizona's Constitution to remove redistricting authority from the Arizona Legislature and vest that authority in an independent commission." *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. 787, 792 (2015). The Arizona Legislature challenged a congressional map adopted by the commission, arguing that the Elections "Clause precludes resort to an independent commission . . . to accomplish redistricting." *Ibid.* A divided Court rejected that argument. The majority reasoned that dictionaries of "the founding era . . . capaciously define[d] the word 'legislature,'" *id.*, at 813–814, and concluded that the people of Arizona retained the authority to create "an alternative legislative process" by vesting the lawmaking power of redistricting in an independent commission, *id.*, at 817. The Court ruled, in short, that although the Elections Clause expressly refers to the "Legislature," it does not preclude a State from vesting congressional redistricting authority in a body other than the elected group of officials who ordinarily exercise lawmaking power. States, the Court explained, "retain autonomy to establish their own governmental processes." *Id.*, at 816.

The significant point for present purposes is that the Court in *Arizona State Legislature* recognized that whatever authority was responsible for redistricting, that entity remained subject to constraints set forth in the State Constitution. The Court embraced the core principle espoused in *Hildebrant* and *Smiley* "that redistricting is a legislative function, to be performed in accordance with the State's pre-

scriptions for lawmaking, which may include the referendum and the Governor's veto." 576 U. S., at 808; see also *id.*, at 840–841 (ROBERTS, C. J., dissenting) (recognizing that *Hildebrant* and *Smiley* support the imposition of "some constraints on the legislature"). The Court dismissed the argument that the Elections Clause divests state constitutions of the power to enforce checks against the exercise of legislative power: "Nothing in [the Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution." 576 U. S., at 817–818 (majority opinion).

The reasoning we unanimously embraced in *Smiley* commands our continued respect: A state legislature may not "create congressional districts independently of" requirements imposed "by the state constitution with respect to the enactment of laws." 285 U. S., at 373.

B

The legislative defendants and the dissent both contend that, because the Federal Constitution gives state legislatures the power to regulate congressional elections, only *that* Constitution can restrain the exercise of that power. Brief for Petitioners 22; *post*, at 56 (opinion of THOMAS, J.). The legislative defendants cite for support Federalist No. 78, which explains that the wielding of legislative power is constrained by "the tenor of the commission under which it is exercised." The Federalist No. 78, at 466; see Tr. of Oral Arg. 4.

This argument simply ignores the precedent just described. *Hildebrant*, *Smiley*, and *Arizona State Legislature* each rejected the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections.

The argument advanced by the defendants and the dissent also does not account for the Framers' understanding that

when legislatures make laws, they are bound by the provisions of the very documents that give them life. Legislatures, the Framers recognized, "are the mere creatures of the State Constitutions, and cannot be greater than their creators." 2 Farrand 88. "What are Legislatures? Creatures of the Constitution; they owe their existence to the Constitution: they derive their powers from the Constitution: It is their commission; and, therefore, all their acts must be conformable to it, or else they will be void." *Vanhorne's Lessee* v. *Dorrance*, 2 Dall. 304, 308 (CC Pa. 1795). *Marbury* confirmed this understanding, 1 Cranch, at 176–177, and nothing in the text of the Elections Clause undermines it. When a state legislature carries out its constitutional power to prescribe rules regulating federal elections, the "commission under which" it exercises authority is two-fold. The Federalist No. 78, at 467. The legislature acts both as a lawmaking body created and bound by its state constitution, and as the entity assigned particular authority by the Federal Constitution. Both constitutions restrain the legislature's exercise of power.

Turning to our precedents, the defendants quote from our analysis of the Electors Clause in *McPherson* v. *Blacker*, 146 U. S. 1 (1892). That Clause—similar to the Elections Clause—provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a [specified] Number of Electors." Art. II, §1, cl. 2. *McPherson* considered a challenge to the Michigan Legislature's decision to allocate the State's electoral votes among the individual congressional districts, rather than to the State as a whole. We upheld that decision, explaining that in choosing Presidential electors, the Clause "leaves it to the legislature exclusively to define the method of effecting the object." 146 U. S., at 27.

Our decision in *McPherson*, however, had nothing to do with any conflict between provisions of the Michigan Constitution and action by the State's legislature—the issue we

confront today. *McPherson* instead considered whether
Michigan's Legislature itself directly violated the Electors
Clause (by taking from the "State" the power to appoint and
vesting that power in separate districts), the Fourteenth
Amendment (by allowing voters to vote for only one Elector
rather than "Electors"), and a particular federal statute.
*Id.*, at 8–9 (argument for plaintiffs in error). Nor does the
quote highlighted by petitioners tell the whole story. Chief
Justice Fuller's opinion for the Court explained that "[t]he
legislative power is the supreme authority *except as limited
by the constitution of the State.*" *Id.*, at 25 (emphasis
added); see also *ibid.* ("What is forbidden or required to be
done by a State is forbidden or required of the legislative
power under state constitutions as they exist.").

The legislative defendants and JUSTICE THOMAS rely as
well on our decision in *Leser* v. *Garnett*, 258 U. S. 130 (1922),
but it too offers little support. See *post*, at 56, 58–60.
*Leser* addressed an argument that the Nineteenth Amend-
ment—providing women the right to vote—was invalid be-
cause state constitutional provisions "render[ed] inoperative
the alleged ratifications by their legislatures." 258 U. S., at
137. We rejected that position, holding that when state leg-
islatures ratify amendments to the Constitution, they carry
out "a federal function derived from the Federal Constitu-
tion," which "transcends any limitations sought to be im-
posed by the people of a State." *Ibid.*

But the legislature in *Leser* performed a ratifying function
rather than engaging in traditional lawmaking. The provi-
sions at issue in today's case—like the provisions examined
in *Hildebrant* and *Smiley*—concern a state legislature's ex-
ercise of lawmaking power. And as we held in *Smiley*, when
state legislatures act pursuant to their Elections Clause au-
thority, they engage in lawmaking subject to the typical con-
straints on the exercise of such power. 285 U. S., at 367.
We have already distinguished *Leser* on those grounds.

*Smiley*, 285 U. S., at 365–366.  In addition, *Leser* cited for support our decision in *Hawke* v. *Smith*, which sharply separated ratification "from legislative action" under the Elections Clause.  253 U. S., at 228.  Lawmaking under the Elections Clause, *Hawke* explained, "is entirely different from the requirement of the Constitution as to the expression of assent or dissent to a proposed amendment to the Constitution."  *Id.*, at 231.

*Hawke* and *Smiley* delineated the various roles that the Constitution assigns to state legislatures.  Legislatures act as "Consent[ing]" bodies when the Nation purchases land, Art. I, §8, cl. 17; as "Ratif[ying]" bodies when they agree to proposed Constitutional amendments, Art. V; and—prior to the passage of the Seventeenth Amendment—as "electoral" bodies when they choose United States Senators, *Smiley*, 285 U. S., at 365; see also Art. I, §3, cl. 1; Amdt. 17 (providing for the direct election of Senators).

By fulfilling their constitutional duty to craft the rules governing federal elections, state legislatures do not consent, ratify, or elect—they make laws.  Elections are complex affairs, demanding rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots.  Legislatures must "provide a complete code for congressional elections," including regulations "relati[ng] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."  *Smiley*, 285 U. S., at 366.  In contrast, a simple up-or-down vote suffices to ratify an amendment to the Constitution.  Providing consent to the purchase of land or electing Senators involves similarly straightforward exercises of authority.  But fashioning regulations governing federal elections "unquestionably calls for the exercise of lawmaking authority."  *Arizona State Legislature*, 576 U. S., at 808, n. 17.  And the

exercise of such authority in the context of the Elections Clause is subject to the ordinary constraints on lawmaking in the state constitution.

In sum, our precedents have long rejected the view that legislative action under the Elections Clause is purely federal in character, governed only by restraints found in the Federal Constitution.

C

Addressing our decisions in *Smiley* and *Hildebrant*, both the legislative defendants and JUSTICE THOMAS concede that at least some state constitutional provisions can restrain a state legislature's exercise of authority under the Elections Clause. But they read those cases to differentiate between procedural and substantive constraints. Brief for Petitioners 24; *post*, at 29 (opinion of THOMAS, J.). *Smiley*, in their view, stands for the proposition that state constitutions may impose only procedural hoops through which legislatures must jump in crafting rules governing federal elections. This concededly "formalistic" approach views the Governor's veto at issue in *Smiley* as one such procedural restraint. Tr. of Oral Arg. 62. But when it comes to substantive provisions, their argument goes, our precedents have nothing to say.

This argument adopts too cramped a view of our decision in *Smiley*. Chief Justice Hughes's opinion for the Court drew no distinction between "procedural" and "substantive" restraints on lawmaking. It turned on the view that state constitutional provisions apply to a legislature's exercise of lawmaking authority under the Elections Clause, with no concern about how those provisions might be categorized. 285 U. S., at 367–368; see also *Hildebrant*, 241 U. S., at 569–570.

The same goes for the Court's decision in *Arizona State Legislature*. The defendants attempt to cabin that case by arguing that the Court did not address substantive limits on the regulation of federal elections. But as in *Smiley*, the

Court's decision in *Arizona State Legislature* discussed no difference between procedure and substance.

The dissent reads *Smiley* and *Arizona State Legislature* in a different light. JUSTICE THOMAS thinks those cases say nothing about whether a State can impose "substantive limits" on the legislature's exercise of power under the Elections Clause. *Post*, at 59. But in *Smiley*, we addressed whether "the conditions which attach to the making of state laws" apply to legislatures exercising authority under the Elections Clause. 285 U. S., at 365. We held that they do. "Much that is urged in argument with regard to the meaning of the term 'Legislature,'" we explained, "is beside the point." *Ibid.* And we concluded in straightforward terms that legislatures must abide by "restriction[s] imposed by state constitutions . . . when exercising the lawmaking power" under the Elections Clause. *Id.*, at 369. *Arizona State Legislature* said much the same, emphasizing that, by its text, nothing in the Elections Clause offers state legislatures *carte blanche* to act "in defiance of provisions of the State's constitution." 576 U. S., at 818.

The defendants and JUSTICE THOMAS do not in any event offer a defensible line between procedure and substance in this context. "The line between procedural and substantive law is hazy." *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 92 (1938) (Reed, J., concurring in part); see also *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393, 419–420 (2010) (Stevens, J., concurring in part and concurring in judgment). Many rules "are rationally capable of classification as either." *Hanna* v. *Plumer*, 380 U. S. 460, 472 (1965); see also *Sun Oil Co.* v. *Wortman*, 486 U. S. 717, 726 (1988) ("Except at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy."). Procedure, after all, is often used as a vehicle to achieve substantive ends. When a governor vetoes a bill because of a disagreement with its policy consequences, has the governor exercised a procedural or substantive restraint

on lawmaking? *Smiley* did not endorse such murky inquiries into the nature of constitutional restraints, and we see no neat distinction today.

### D

Were there any doubt, historical practice confirms that state legislatures remain bound by state constitutional restraints when exercising authority under the Elections Clause. We have long looked to "settled and established practice" to interpret the Constitution. *The Pocket Veto Case*, 279 U. S. 655, 689 (1929). And we have found historical practice particularly pertinent when it comes to the Elections and Electors Clauses. *Smiley*, 285 U. S., at 369 (Elections Clause); *Chiafalo* v. *Washington*, 591 U. S. ——, —— – —— (2020) (Electors Clause).

Two state constitutional provisions adopted shortly after the founding offer the strongest evidence. Delaware's 1792 Constitution provided that the State's congressional representatives "shall be voted for at the same places where representatives in the State legislature are voted for, and in the same manner." Art. VIII, §2. Even though the Elections Clause stated that the "Places" and "Manner" of federal elections shall be "prescribed" by the state legislatures, the Delaware Constitution expressly enacted rules governing the "places" and "manner" of holding elections for federal office. An 1810 amendment to the Maryland Constitution likewise embodied regulations falling within the scope of the Elections and Electors Clauses. Article XIV provided that every qualified citizen "shall vote, by ballot, . . . for electors of the President and Vice-President of the United States, [and] for Representatives of this State in the Congress of the United States." If the Elections Clause had vested exclusive authority in state legislatures, unchecked by state courts enforcing provisions of state constitutions, these clauses would have been unenforceable from the start.

Besides the two specific provisions in Maryland and Delaware, multiple state constitutions at the time of the founding

regulated federal elections by requiring that "[a]ll elections shall be by ballot."   Ga. Const., Art. IV, §2 (1789); see also, *e. g.,* Pa. Const., Art. III, §2 (1790); Ky. Const., Art. III, cl. 2 (1792); Tenn. Const., Art. III, §3 (1796); Ohio Const., Art. IV, §2 (1803); La. Const., Art. VI, §13 (1812).   These provisions directed the "manner" of federal elections within the meaning of the Elections Clause, as Madison himself explained at the Constitutional Convention.   See 2 Farrand 240 ("Whether the electors should vote by ballot or vivâ voce" falls within the "great latitude" of "regulating the times places & manner of holding elections").

The legislative defendants discount this evidence.   They argue that those "by ballot" provisions spoke only "to the offices that were created by" state constitutions, and not to the federal offices to which the Elections Clause applies.   Tr. of Oral Arg. 18.   We find no textual hook for that strained reading.   "All" meant then what it means now.

In addition, the Framers did not write the Elections Clause on a blank slate—they instead borrowed from the Articles of Confederation, which provided that "delegates shall be annually appointed in such manner as the legislature of each state shall direct."   Art. V.   The two provisions closely parallel.   And around the time the Articles were adopted by the Second Continental Congress, multiple States regulated the "manner" of "appoint[ing] delegates," *ibid.*, suggesting that the Framers did not understand that language to insulate state legislative action from state constitutional provisions.   See Del. Const., Art. XI (1776); Md. Const., Art. XXVII (1776); Va. Const., cls. 3–4 (1776); Pa. Const., §11 (1776); N. C. Const., Art. XXXVII (1776); Ga. Const., Art. XVI (1777); N. Y. Const., Art. XXX (1777); S. C. Const., Art. XXII (1778); Mass. Const., pt. 2, ch. IV (1780); N. H. Const., pt. II (1784).

The defendants stress an 1820 convention held in Massachusetts to amend the Commonwealth's Constitution.   After a Boston delegate proposed a provision regulating the man-

ner of federal elections, Joseph Story—then a Justice of this
Court—nixed the effort. In Story's view, such a provision
would run afoul of the Elections Clause by "assum[ing] a
control over the Legislature, which the constitution of the
United States does not justify." Journal of the Debates and
Proceedings in the Convention of Delegates 110 (1853). But
Story's comment elicited little discussion, and reflects the
views of a jurist who, although "a brilliant and accomplished
man, . . . was not a member of the Founding generation."
*U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 856 (1995)
(THOMAS, J., dissenting).

V

A

Although we conclude that the Elections Clause does not
exempt state legislatures from the ordinary constraints im-
posed by state law, state courts do not have free rein.
"State courts are the appropriate tribunals . . . for the deci-
sion of questions arising under their local law, whether statu-
tory or otherwise." *Murdock* v. *Memphis*, 20 Wall. 590, 626
(1875). At the same time, the Elections Clause expressly
vests power to carry out its provisions in "the Legislature"
of each State, a deliberate choice that this Court must re-
spect. As in other areas where the exercise of federal au-
thority or the vindication of federal rights implicates ques-
tions of state law, we have an obligation to ensure that state
court interpretations of that law do not evade federal law.

State law, for example, "is one important source" for de-
fining property rights. *Tyler* v. *Hennepin County*, 598 U. S.
631, 638 (2023); see also *Board of Regents of State Colleges*
v. *Roth*, 408 U. S. 564, 577 (1972) (property rights "are cre-
ated and their dimensions are defined by existing rules or
understandings that stem from an independent source such
as state law"). At the same time, the Federal Constitution
provides that "private property" shall not "be taken for pub-
lic use, without just compensation." Amdt. 5. As a result,

States "may not sidestep the Takings Clause by disavowing traditional property interests." *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998); see also *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 164 (1980) (holding that States may not, "by *ipse dixit*, . . . transform private property into public property without compensation").

A similar principle applies with respect to the Contracts Clause, which provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." Art. I, §10, cl. 1. In that context "we accord respectful consideration and great weight to the views of the State's highest court." *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 100 (1938). Still, "in order that the constitutional mandate may not become a dead letter, we are bound to decide for ourselves whether a contract was made." *Ibid.*; see also *General Motors Corp.* v. *Romein*, 503 U. S. 181, 187 (1992).

Cases raising the question whether adequate and independent grounds exist to support a state court judgment involve a similar inquiry. We have in those cases considered whether a state court opinion below adopted novel reasoning to stifle the "vindication in state courts of . . . federal constitutional rights." *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 457–458 (1958).

Running through each of these examples is the concern that state courts might read state law in such a manner as to circumvent federal constitutional provisions. Therefore, although mindful of the general rule of accepting state court interpretations of state law, we have tempered such deference when required by our duty to safeguard limits imposed by the Federal Constitution.

Members of this Court last discussed the outer bounds of state court review in the present context in *Bush* v. *Gore*, 531 U. S. 98 (2000) (*per curiam*). Our decision in that case turned on an application of the Equal Protection Clause of the Fourteenth Amendment. *Id.*, at 104–105. In separate

writings, several Justices addressed whether Florida's Supreme Court, in construing provisions of Florida statutory law, exceeded the bounds of ordinary judicial review to an extent that its interpretation violated the Electors Clause.

Chief Justice Rehnquist, joined in a concurring opinion by JUSTICE THOMAS and Justice Scalia, acknowledged the usual deference we afford state court interpretations of state law, but noted "areas in which the Constitution requires this Court to undertake an independent, if still deferential, analysis of state law." *Id.*, at 114. He declined to give effect to interpretations of Florida election laws by the Florida Supreme Court that "impermissibly distorted them beyond what a fair reading required." *Id.*, at 115. Justice Souter, for his part, considered whether a state court interpretation "transcends the limits of reasonable statutory interpretation to the point of supplanting the statute enacted by the 'legislature' within the meaning of Article II." *Id.*, at 133 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ., dissenting).

We do not adopt these or any other test by which we can measure state court interpretations of state law in cases implicating the Elections Clause. The questions presented in this area are complex and context specific. We hold only that state courts may not transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections.

## B

We decline to address whether the North Carolina Supreme Court strayed beyond the limits derived from the Elections Clause. The legislative defendants did not meaningfully present the issue in their petition for certiorari or in their briefing, nor did they press the matter at oral argument. See *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 206–208 (1997); see also *California* v. *Texas*, 593 U. S. ——, —— (2021).

Counsel for the defendants expressly disclaimed the argument that this Court should reassess the North Carolina Supreme Court's reading of state law. Tr. of Oral Arg. 7 ("We're not asking this Court to second-guess or reassess. We say take the North Carolina Supreme Court's decision on face value and as fairly reflecting North Carolina law . . . ."). When pressed whether North Carolina's Supreme Court did not fairly interpret its State Constitution, counsel reiterated that such an argument was "not our position in this Court." *Id.*, at 54. Although counsel attempted to expand the scope of the argument in rebuttal, such belated efforts do not overcome prior failures to preserve the issue for review. See this Court's Rule 28 ("[C]ounsel making the opening argument shall present the case fairly and completely and not reserve points of substance for rebuttal.").

\* \* \*

State courts retain the authority to apply state constitutional restraints when legislatures act under the power conferred upon them by the Elections Clause. But federal courts must not abandon their own duty to exercise judicial review. In interpreting state law in this area, state courts may not so exceed the bounds of ordinary judicial review as to unconstitutionally intrude upon the role specifically reserved to state legislatures by Article I, Section 4, of the Federal Constitution. Because we need not decide whether that occurred in today's case, the judgment of the North Carolina Supreme Court is affirmed.[2]

*It is so ordered.*

---

[2] As noted, *supra*, at 13–14, the North Carolina Supreme Court withdrew the opinion in *Harper II*, which addressed both the remedial maps developed by the General Assembly and an order by the trial court implementing an interim plan for the 2022 elections. The remedial order, having been withdrawn, is not before us, and our decision today does not pass on the constitutionality of any particular map adopted by the state courts.

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. The Court today correctly concludes that state laws governing federal elections are subject to ordinary state court review, including for compliance with the relevant state constitution. *Ante*, at 22, 34, 37. But because the Elections Clause assigns authority respecting federal elections to state legislatures, the Court also correctly concludes that "state courts do not have free rein" in conducting that review. *Ante*, at 34. Therefore, a state court's interpretation of state law in a case implicating the Elections Clause is subject to federal court review. *Ante*, at 34–37; see also *Bush* v. *Palm Beach County Canvassing Bd.*, 531 U. S. 70, 76–78 (2000) (unanimously concluding that a state court's interpretation of state law in a federal election case presents a federal issue); cf. *Democratic National Committee* v. *Wisconsin State Legislature*, 592 U. S. ——, ——, n. 1 (2020) (KAVANAUGH, J., concurring in denial of application to vacate stay). Federal court review of a state court's interpretation of state law in a federal election case "does not imply a disrespect for state *courts* but rather a respect for the constitutionally prescribed role of state *legislatures*." *Bush* v. *Gore*, 531 U. S. 98, 115 (2000) (Rehnquist, C. J., concurring).

The question, then, is what standard a federal court should employ to review a state court's interpretation of state law in a case implicating the Elections Clause—whether Chief Justice Rehnquist's standard from *Bush* v. *Gore*; Justice Souter's standard from *Bush* v. *Gore*; the Solicitor General's proposal in this case; or some other standard.

Chief Justice Rehnquist's standard is straightforward: whether the state court "impermissibly distorted" state law "beyond what a fair reading required." *Ibid.* As I understand it, Justice Souter's standard, at least the critical language, is similar: whether the state court exceeded "the limits of reasonable" interpretation of state law. *Id.*, at 133 (dissenting opinion). And the Solicitor General here has

proposed another similar approach: whether the state court reached a "truly aberrant" interpretation of state law. Brief for United States as *Amicus Curiae* 27.

As I see it, all three standards convey essentially the same point: Federal court review of a state court's interpretation of state law in a federal election case should be deferential, but deference is not abdication.[1] I would adopt Chief Justice Rehnquist's straightforward standard. As able counsel for North Carolina stated at oral argument, the Rehnquist standard "best sums it up." Tr. of Oral Arg. 131. Chief Justice Rehnquist's standard should apply not only to state court interpretations of state statutes, but also to state court interpretations of state constitutions. And in reviewing state court interpretations of state law, "we necessarily must examine the law of the State as it existed prior to the action of the [state] court." *Bush*, 531 U. S., at 114 (Rehnquist, C. J., concurring).

Petitioners here, however, have disclaimed any argument that the North Carolina Supreme Court misinterpreted the North Carolina Constitution or other state law. See *ante*, at 37.[2] For now, therefore, this Court need not, and ultimately does not, adopt any specific standard for our review of a state court's interpretation of state law in a case implicating the Elections Clause. See *ante*, at 36 ("We do not adopt these or any other test by which we can measure state

––––––––

[1] I doubt that there would be a material difference in application among the standards formulated by Chief Justice Rehnquist, Justice Souter, and the Solicitor General, given the similarities in the three standards, at least as described above. To be sure, different judges may reach different conclusions in an individual case about whether a particular state court interpretation is impermissible under the chosen standard. But I doubt that the precise formulation of the standard—assuming it is Chief Justice Rehnquist's, Justice Souter's, or the Solicitor General's—would be the decisive factor in any such disagreement.

[2] Instead, petitioners make the broader argument, which the Court today properly rejects, that the Elections Clause bars state courts from reviewing state laws for compliance with the relevant state constitution.

court interpretations of state law in cases implicating the Elections Clause"). Instead, the Court today says simply that "state courts do not have free rein" and "hold[s] only that state courts may not transgress the ordinary bounds of judicial review." *Ante*, at 34, 36. In other words, the Court has recognized and articulated a general principle for federal court review of state court decisions in federal election cases. In the future, the Court should and presumably will distill that general principle into a more specific standard such as the one advanced by Chief Justice Rehnquist.

With those additional comments, I agree with the Court's conclusions that (i) state laws governing federal elections are subject to ordinary state court review, and (ii) a state court's interpretation of state law in a case implicating the Elections Clause is in turn subject to federal court review.

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, and with whom JUSTICE ALITO joins as to Part I, dissenting.

This Court sits "to resolve not questions and issues but 'Cases' or 'Controversies.'" *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. 125, 132 (2011); see U. S. Const., Art. III, § 1. As a corollary of that basic constitutional principle, the Court "is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it." *St. Pierre* v. *United States*, 319 U. S. 41, 42 (1943) (*per curiam*). To do so would be to violate "the oldest and most consistent thread in the federal law of justiciability." *Flast* v. *Cohen*, 392 U. S. 83, 96 (1968) (internal quotation marks omitted).

The opinion that the Court releases today breaks that thread. It "affirms" an interlocutory state-court judgment that has since been overruled and supplanted by a final judgment resolving all claims in petitioners' favor. The issue on which it opines—a federal defense to claims already dismissed on other grounds—can no longer affect the judgment

in this litigation in any way. As such, the question is indisputably moot, and today's majority opinion is plainly advisory. Because the writ of certiorari should be dismissed, I respectfully dissent.

I

Here is the case before us in a nutshell: A group of plaintiffs sued various state officials under state law. The defendants raised both state-law and federal-law defenses. In the interlocutory judgment below, the State Supreme Court rejected both defenses and remanded for further proceedings. We granted review to consider the defendants' federal defense. But then, in subsequent proceedings, the state court revisited defendants' alternative state-law defense and held that it was meritorious. As a result, the court finally adjudicated the whole case in the defendants' favor, dismissing the plaintiffs' claims with prejudice.

This is a straightforward case of mootness. The federal defense no longer makes any difference to this case—whether we agree with the defense, disagree with it, or say nothing at all, the final judgment in this litigation will be exactly the same. The majority does not seriously contest that fact. Even so, it asserts jurisdiction to decide this free-floating defense that affects no live claim for relief, reasoning that a justiciable case or controversy exists as long as its opinion can in any way "alter the presently operative statutes of" a State. *Ante*, at 15 (internal quotation marks omitted). By its own lights, the majority "is acting not as an Article III court," *Uzuegbunam* v. *Preczewski*, 592 U. S. ——, —— (2021) (ROBERTS, C. J., dissenting), but as an ad hoc branch of a state legislature. That is emphatically not our job. Compare U. S. Const., Art. III, § 1, with N. C. Const., Art. II, § 1.

A

To review the history of this case is to demonstrate that the question presented is moot. In 2021, the North Carolina

General Assembly passed an Act to redistrict the State for
elections to the U. S. House of Representatives. Plaintiffs-
respondents filed an action in state court, seeking to en-
join state elections officials (defendants-respondents here)
from conducting elections in accord with the Act.[1] They
based their claim for relief on the North Carolina Con-
stitution, which they argued prohibits excessive partisan
gerrymanders.

Petitioners, state legislators representing North Carolina's
interest in the enforcement of the Act, see N. C. Gen. Stat.
Ann. § 1–72.2 (2021); *Berger* v. *North Carolina State Confer-
ence of the NAACP*, 597 U. S. ——, ——, —— – —— (2022),
raised defenses under both state and federal law. As rele-
vant here, they argued: (1) that partisan-gerrymandering
claims are not justiciable under the North Carolina Constitu-
tion; and (2) that the State Constitution cannot restrict the
General Assembly's congressional districting legislation
under the federal Elections Clause, U. S. Const., Art. I, § 4,
cl. 1.

Initially, a three-judge trial court endorsed petitioners'
state-law defense and entered a final judgment dismissing
plaintiffs-respondents' claims with prejudice. But, on ap-
peal, the North Carolina Supreme Court reversed that judg-
ment. See *Harper* v. *Hall*, 380 N. C. 317, 868 S. E. 2d 499
(2022) (*Harper I*). In *Harper I*, the court held that the 2021
Act violated the State Constitution, enjoined its implementa-
tion, and remanded the case to the trial court for remedial
proceedings. In doing so, *Harper I* rejected both petition-
ers' state-law justiciability defense and their federal Elec-
tions Clause defense.

––––––––
[1] Technically, there were two state-court actions below. These actions
have been consolidated at every stage and can be regarded as one action
for all relevant purposes. For simplicity, I will use the singular. Also
for simplicity, I focus here on plaintiffs-respondents' challenge to the 2021
congressional districting map, putting aside their parallel challenges to
the Assembly's 2021 State House and State Senate maps.

Petitioners then sought this Court's review of *Harper I* insofar as it rejected their federal defense. From the start, they faced a significant jurisdictional question. Our appellate jurisdiction over state courts is limited to "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." 28 U. S. C. § 1257(a). But *Harper I* was "a classic example of non-finality"; it was an order that resolved the issue of liability and remanded for remedial proceedings. *Taylor* v. *Board of Ed. of City School Dist. of New Rochelle*, 288 F. 2d 600, 602 (CA2 1961) (Friendly, J.). Thus, under the normal rules, *Harper I* would not be "reviewable by this Court." *Jefferson* v. *City of Tarrant*, 522 U. S. 75, 81 (1997).

Nonetheless, this Court's precedents have recognized "a limited set of situations" in which "finality as to [a] federal *issue*" permits our review, even in the absence of a final judgment as to the *case*. *O'Dell* v. *Espinoza*, 456 U. S. 430 (1982) (*per curiam*) (emphasis added). In granting certiorari, we relied on one of those doctrinal exceptions, premised on the assumption that "the federal issue" in this case would "survive and require decision regardless of the outcome of future state-court proceedings." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 480 (1975).

As it turned out, that assumption was wrong. After *Harper I*, on remand, the trial court adopted a remedial districting plan for the 2022 elections. Petitioners then appealed that order, taking the case to the North Carolina Supreme Court for a second time. Initially, the North Carolina Supreme Court released an opinion applying *Harper I* and affirming the trial court's decree. *Harper* v. *Hall*, 383 N. C. 89, 881 S. E. 2d 156 (2022) (*Harper II*). But then, after granting petitioners' request for rehearing, the court "revisit[ed] the crucial issue in this case: whether claims of partisan gerrymandering are justiciable under the state constitution." *Harper* v. *Hall*, 384 N. C. 292, 299, 886 S. E. 2d 393, 399 (2023) (*Harper III*). After reexamining "the fundamental

premises underlying the decisions in both *Harper II* and
*Harper I*," the court "h[e]ld that partisan gerrymandering
claims present a political question that is nonjusticiable
under the North Carolina Constitution." *Id.*, at 300, 886
S. E. 2d, at 400–401. It concluded:

> "This Court's opinion in *Harper I* is overruled. We
> affirm the three-judge panel's [original] 11 January 2022
> Judgment concluding, *inter alia*, that claims of partisan
> gerrymandering present nonjusticiable, political ques-
> tions and dismissing all of plaintiffs' claims with preju-
> dice. This Court's opinion in *Harper II* is withdrawn
> and superseded by this opinion. The three-judge pan-
> el's 23 February 2022 order addressing the Remedial
> Plans is vacated. Plaintiffs' claims are dismissed with
> prejudice." *Id.*, at 379, 886 S. E. 2d, at 449.

In short, this case is over, and petitioners won. The trial
court's original final judgment in favor of petitioners, af-
firmed by the State Supreme Court in *Harper III*, repre-
sents "the final determination of the rights of the parties" in
this case. N. C. Rule Civ. Proc. 54(a) (2023). *Harper I* has
been overruled, and plaintiffs-respondents' claims for relief
have been dismissed on adequate and independent state-law
grounds. As a result, petitioners' alternative Elections
Clause defense to those claims no longer requires decision;
the merits of that defense simply have no bearing on the
judgment between the parties in this action. That is the
definition of mootness for an issue.

It follows that no live controversy remains before this
Court. For any case or controversy to exist here, petition-
ers must be injured by the judgment below, and we must be
able to redress that injury by acting upon that judgment.
See, *e. g.*, *Food Marketing Institute* v. *Argus Leader Media*,
588 U. S. ——, —— (2019); see also *Ex parte Bollman*,
4 Cranch 75, 86 (1807) ("The criterion [of] appellate . . . jur-
isdiction, is that it revises and corrects the decisions of

another tribunal"). But petitioners are not injured by the judgment of *Harper I* at all, nor could we redress any injury to petitioners by doing anything to it. Whether we accept or reject petitioners' Elections Clause defense, plaintiffs-respondents' claims remain dismissed. As far as this case is concerned, there simply is nothing this Court could decide that could make any difference to who wins or what happens next in any lower court. That is the definition of mootness for an appellate proceeding.

The United States understands this. See Supplemental Letter Brief for United States as *Amicus Curiae* 3 (May 11, 2023) ("[T]he question this Court granted certiorari to decide is now moot because the Court's resolution of that question could not affect the disposition of this case"). So do the elections officials whose conduct *Harper I* once enjoined. Supplemental Brief for State Respondents 1 (May 11, 2023) ("[T]his case is moot"). So, too, do the plaintiffs-respondents who started this case in the first place. See Letter Brief for North Carolina League of Conservation Voters, Inc., et al. 2 (May 11, 2023) ("The North Carolina Supreme Court's February 2022 judgment *reversing* the same January 11, 2022 trial-court judgment that the North Carolina Supreme Court just *affirmed* is now a nullity"); Supplemental Letter Brief for Rebecca Harper et al. 1 (May 11, 2023) ("Petitioners have won a full victory in state court"). As one group of plaintiffs-respondents put it, "there is no non-frivolous basis for jurisdiction here." *Ibid.*

B

The majority does not contest that the Elections Clause issue in this case was only a defense to plaintiffs-respondents' claims for relief. Nor does it deny that *Harper III* overruled *Harper I* and affirmed the very same trial-court judgment that *Harper I* had reversed. And it concedes that, as a result, plaintiffs-respondents' claims have been dismissed in full on state-law nonjusticiability grounds.

Thus, the majority does not contend that its opinion on the Elections Clause issue could make any difference to the final judgment "adjudicating all the claims and the rights and liabilities of all the parties" in this case. N. C. Rule Civ. Proc. 54(b). That should be the end of the discussion. Because the question presented "cannot affect the rights of [the] litigants in the case before [us]," we "are without power to decide" it. *North Carolina* v. *Rice,* 404 U. S. 244, 246 (1971) (*per curiam*).

Nonetheless, the majority finds that the judgment below still presents a live Article III case or controversy; it then further concludes that the question presented has survived and requires decision under *Cox Broadcasting.*[2] See *ante,* at 14–19. In doing so, it relies extensively on petitioners' "representations" that they "remain bound by the judgment in *Harper I.*" *Ante,* at 18; see also *ante,* at 13, 15. But, of course, parties' mere representations that they are injured never carry their "burden of *demonstrating* that they have standing" in this Court. *TransUnion LLC* v. *Ramirez,* 594 U. S. ——, —— (2021) (emphasis added). Nor can such representations affect our "independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits." *Plains Commerce Bank* v. *Long Family Land & Cattle Co.,* 554 U. S. 316, 324 (2008).

To ensure that it has jurisdiction here, the majority must explain how petitioners' federal defense could still affect "the rights of [the] litigants in th[is] case." *Rice,* 404 U. S., at 246. It fails to do so. Instead, it mostly points to irrelevant

---

[2] In this case, these two inquiries are identical, making the majority's bifurcated analysis somewhat artificial. To say that an issue "will survive and require decision," as *Cox Broadcasting* uses the phrase, simply means that it will not become moot, generally through some other issue independently resolving the case (precisely what happened here). See, *e. g., Pierce County* v. *Guillen,* 537 U. S. 129, 141, n. 5 (2003); *Florida* v. *Thomas,* 532 U. S. 774, 779 (2001); *Jefferson* v. *City of Tarrant,* 522 U. S. 75, 82–83 (1997); *Cox Broadcasting,* 420 U. S., at 478, 480–481, and n. 9.

facts about the procedural history of this case and misapplies civil-procedure rules as if *Harper I* and *Harper III* did not involve the same case. But the error that actually drives the majority's conclusion is much deeper. The majority evidently thinks that when *Harper I* held the 2021 Act unconstitutional, it entered a "judgment" affecting the 2021 Act *as a statute*, independent of its application to the legal rights of the litigants in this case. And the majority thinks that to reverse *Harper I*'s "judgment" would "negate the force of its order striking down" the Act, thus "alter[ing] the presently operative statutes of North Carolina." *Ante*, at 15 (internal quotation marks omitted). But, of course, the judicial power does not "operate on legal rules in the abstract"; it operates on the rights and liabilities of contending parties with adverse legal interests. *California* v. *Texas*, 593 U. S. —, — (2021) (internal quotation marks omitted). The majority's reasoning cannot be squared with the judicial power vested by the Constitution, the case-or-controversy requirement, or the nature of judicial review.

I start by clearing away some of the brush. True, *Harper III* did not expressly "revisit" the Elections Clause issue, *ante*, at 14; true as well, petitioners did not obtain rehearing of *Harper I*, see *ante*, at 15. But none of that matters because *Harper III*'s final judgment mooted the Elections Clause issue in this case by dismissing plaintiffs-respondents' claims on alternative state-law grounds.[3] Likewise, the idea

───────────

[3] Incidentally, the majority seriously errs when it says that *Harper III* "reaffirmed" *Harper I*'s Elections Clause holding, *ante*, at 17, apparently referencing *Harper III*'s statement that "[t]he General Assembly exercises [redistricting] authority subject to the express limitations in our constitution and in federal law," 384 N. C., at 336, 886 S. E. 2d, at 422; see also *ante*, at 14. The only "express limitations" *Harper III* meant were "Article II, Sections 3 and 5," of the State Constitution, which address only state-legislative districts. 384 N. C., at 336, 886 S. E. 2d, at 422. As *Harper III* acknowledged, "there is no provision in the state constitution regarding redistricting of congressional districts." *Id.*, at 330, 886 S. E. 2d, at 419. To the extent that *Harper III* suggests any view about

that *Harper III* did not "alter or amend in any way the judgment in *Harper I*," *ante*, at 17, is both irrelevant and incorrect. It is irrelevant because our jurisdiction requires a *case*, and this *case* is over no matter what becomes of the empty husk of *Harper I*'s interlocutory judgment. It is incorrect because *Harper I*'s judgment—reversing the trial court's original judgment and remanding the case—was completely negated by *Harper III*'s affirmance of the same trial-court judgment.

In the same vein, the majority's suggestion that *Harper I* has any "res judicata consequences" is completely inapposite. *Ante*, at 17 (internal quotation marks omitted). Res judicata is the principle that "[a] final judgment on the merits of an action" bars relitigation "in [a] second action" of the same claim or of issues actually litigated and necessary to the judgment in the first action. *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 398 (1981); see also *Taylor* v. *Sturgell*, 553 U. S. 880, 892 (2008). *Harper I* was not a final judgment (as the majority concedes by applying *Cox Broadcasting*), so res judicata simply has nothing to do with it. Nothing decided by *Harper I* was res judicata in the second state-court appeal, see *Southern R. Co.* v. *Clift*, 260 U. S. 316, 319 (1922), nor would *Harper I*'s interlocutory Elections Clause holding have any res judicata effect in a future action between these parties, see Restatement (Second) of Judgments § 27, and Comment *h*, and Illus. 13 and 14 (1980) (only issue determinations essential to a final judgment have preclusive effect; if a defendant obtains a final judgment based on one defense, the court's rejection of alternative defenses

whether such provisions would be binding if they existed, it seems to suggest agreement with petitioners. See *ibid.* ("The Federal Constitution . . . commits drawing of congressional districts to the state legislatures subject to oversight by the Congress of the United States"). But, of course, *Harper III* had no need to decide that question, because its state-law justiciability holding fully determined the judgment in this action, thus mooting petitioners' alternative Elections Clause defense.

is not preclusive in a later action). At the risk of belaboring the obvious, the clearest proof that *Harper I* was not a final judgment is *Harper III*—which "revisit[ed]" *Harper I*'s determination of a "crucial issue in this case," 384 N. C., at 299, 886 S. E. 2d, at 399; overruled *Harper I*'s determination of that issue; and affirmed the very same final judgment for petitioners that *Harper I* had reversed.[4]

How could petitioners still be injured, and what more could this Court possibly do for them? The majority suggests that the interlocutory injunction issued in *Harper I* still harms petitioners, see *ante*, at 15, 18–19, but that idea is untenable. To start, the majority overlooks that the injunction only ran against the conduct of defendants-respondents—the state officials who actually implement election laws—not petitioners as legislators. See *Berger*, 597 U. S., at ——. Next, the majority fails to consider what it would mean if the injunction is still binding: that defendants-respondents are liable to "be held in contempt and put in jail" if they ever implement the 2021 Act, *Richmond Cty. Bd. of Ed.* v. *Cowell*, 254 N. C. App. 422, 426, 803 S. E. 2d 27, 30–31 (2017), even though *Harper III* dismissed this suit's challenge to the Act as "beyond the reach of [North Carolina's] courts," 384 N. C., at 350, 886 S. E. 2d, at 431 (internal quotation marks omitted). That idea defies both common sense and civil procedure. A court simply does not go on enforcing an interlocutory injunction—and imposing contempt sanctions for disobedience—after reaching a final

---

[4] These facts refute the majority's dismissive reference to *Harper III* as "a distinct decision concerning remedies," as well as any suggestion that *Harper III* was "another case" than *Harper I* for res judicata purposes. *Ante*, at 17–18 (internal quotation marks omitted). *Harper I* and *Harper III* involved exactly the same case, and there is "only one final judgment per case." *Chaka* v. *Lane*, 894 F. 2d 923, 924 (CA7 1990) (Easterbrook, J.); see also *Insurance Co.* v. *Dunn*, 19 Wall. 214, 225 (1874) ("To say that there can be *two* final judgments upon the same pleadings, in the same cause, in the same court, . . . involves a solecism"). In this case, it was not *Harper I*.

judgment dismissing every relevant claim for relief. Rather, the interlocutory injunction (like all interlocutory orders) merges into the final judgment fully "adjudicating all the claims and the rights *and liabilities* of all the parties" to the case. N. C. Rule Civ. Proc. 54(b) (emphasis added). "With the entry of [*Harper III*'s] final judgment, the life of [*Harper I*'s] injunction came to an end, and it no longer ha[s] a binding effect on any one." *Madison Square Garden Boxing, Inc.* v. *Shavers*, 562 F. 2d 141, 144 (CA2 1977).

In any event, the majority's analysis plainly does not turn on the belief that any defendant remains liable to potential contempt sanctions and jail time. Instead, its animating idea (uncritically borrowed from petitioners) is that *Harper I*'s "judgment" operated against the 2021 Act *as a statute*. The majority describes *Harper I*'s "judgment" interchangeably as "enjoining the use of the 2021 pla[n]" and "striking down the 2021 pla[n]." *Ante*, at 15, 17. It then reasons that reversing that "judgment" would "negate the force of its order striking down the 2021 pla[n]," thus "alter[ing] the presently operative statutes of North Carolina" such that the 2021 Act would "again take effect." *Ante*, at 15 (internal quotation marks omitted). The majority regards this aspect of *Harper I*'s "judgment" as entirely independent of *Harper III*'s final resolution of the claims in this case. See *ante*, at 13–16, 18–19. And it finds its theory "confirm[ed]" by a proviso in a remedial redistricting Act, passed immediately after *Harper I*, stating that the 2021 Act would "again become effective" if this Court reversed *Harper I*. *Ante*, at 16 (internal quotation marks omitted). In short, the "case or controversy" that the majority thinks is still before us has nothing to do with the parties' rights and liabilities on the claims asserted in this action; rather, it is simply whether a particular legislative Act, which *Harper I* supposedly made inoperative, will again be "operative" or "effective" as a state statute. *Ante*, at 15–16 (internal quotation marks omitted).

This reasoning bears no connection to the judicial power of this Court or the court below. Judicial power is the power to adjudicate "definite and concrete" disputes "touching the legal relations of parties having adverse legal interests," *Rice*, 404 U. S., at 246 (internal quotation marks omitted), by "determin[ing] the respective rights and liabilities or duties" of the parties before a court in a particular case, *Nicholson* v. *State Ed. Assistance Auth.*, 275 N. C. 439, 447, 168 S. E. 2d 401, 406 (1969). Thus, a judgment binds the rights of the parties in that case, see *Taylor*, 553 U. S., at 892–893, and it awards remedies that "operate with respect to [those] specific parties," *California*, 593 U. S., at —— (internal quotation marks omitted). In deciding any case, the court must "ascertai[n] and declar[e] the law applicable to the controversy"; this duty, in turn, implies "the negative power to disregard an unconstitutional enactment" in deciding the case. *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923); accord, *Nicholson*, 275 N. C., at 447, 168 S. E. 2d, at 406; *Marbury* v. *Madison*, 1 Cranch 137, 176–178 (1803). But this negative power of judicial review is not a "power *per se* to review and annul acts of [legislation] on the ground that they are unconstitutional," *Mellon*, 262 U. S., at 488; "to change or to repeal statutes," *Person* v. *Doughton*, 186 N. C. 723, 725, 120 S. E. 481, 483 (1923); or to issue orders that "operate on legal rules in the abstract," *California*, 593 U. S., at —— (internal quotation marks omitted). Courts of law simply do not render "judgments" that toggle statutes from "operative" to "inoperative" and back again, as if judicial review were some sort of *in rem* jurisdiction over legislative Acts.

Indeed, such a conception would contradict the most basic premise of judicial review itself. "[A]n unconstitutional provision is *never* really part of the body of governing law," for "the Constitution automatically displaces [it] from the moment of [its] enactment." *Collins* v. *Yellen*, 594 U. S. ——, —— (2021) (emphasis added). Thus, when a court holds

a statute unconstitutional, it is emphatically not depriving it of any legal force that it previously possessed as an Act. The court is only deciding "a particular case" "conformably to the constitution, disregarding" a statute that cannot "govern the case" because it is already "void." *Marbury*, 1 Cranch, at 178; accord, *Bayard* v. *Singleton*, 1 N. C. 5, 7 (1787) (holding that the unconstitutional "act on which [a party's] motion was grounded . . . must of course, in that instance, stand as abrogated and without any effect"). "That is the classic explanation for the basis of judicial review" set forth in *Marbury* and *Bayard*, and it remains "from that day to this the sole continuing rationale for the exercise of this judicial power." *Mackey* v. *United States*, 401 U. S. 667, 678 (1971) (Harlan, J., concurring in judgment in part and dissenting in part).

The majority's theory thus fails twice over, both as a description of *Harper I*'s "judgment" and as an explanation of how any justiciable controversy could exist in this Court. The only power that the North Carolina courts exercised at any stage of this case was that of "determin[ing] the respective rights and liabilities or duties of litigants in [the] controversy" before them. *Nicholson*, 275 N. C., at 447, 168 S. E. 2d, at 406. *Harper I*'s judgment line did not read: "Stricken down," referring to the 2021 Act, but instead: "Reversed and remanded," referring to the lower court judgment and the case between these parties. 380 N. C., at 404, 868 S. E. 2d, at 560 (some capitalization deleted). The judicial power operates upon parties and cases, not statutes, and *Harper I* was no exception.[5]

---

[5] Nor did *Harper III*, despite agreeing with petitioners in all other respects, anywhere endorse their belief that some "order striking down the 2021 [Act]" would survive a decision overruling *Harper I* and dismissing this lawsuit with prejudice. *Ante*, at 13 (internal quotation marks omitted). To the extent that the majority imputes that idea to *Harper III*, it again seriously misreads that decision. See n. 3, *supra*. The majority states that *Harper III* "did not reinstate the 2021 congressional pla[n] that *Harper I* had struck down." *Ante*, at 13 (citing *Harper III*, 384 N. C., at 374–378, 886 S. E. 2d, at 446–448). But the part of *Harper III* that the

Even if it were, we would still have no case or controversy in front of us. A freestanding "judgment" of statutory invalidation—neutralizing the 2021 Act in some manner transcending the final determination of the parties' respective rights in this case—would not be a judicial action within the meaning of Article III, and it could not be reviewed in this Court. See *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226–227 (1908). "We sit as a court of law, not a council of revision," and "[o]ur powers of judicial review are judicial, not legislative, in nature." *Mackey*, 401 U. S., at 697 (opinion of Harlan, J.). The only power that we ever could have exercised here was to modify the adjudicated rights and liabilities of the parties with respect to the claims in this action. Because we plainly cannot do so, no matter what we think about the Elections Clause, this proceeding is moot. And the idea that we could still decide petitioners' moot federal defense because it could "alter the presently operative statutes of North Carolina"—even if it cannot affect the ultimate judgment in this action—is wholly foreign to Article III. *Ante*, at 15 (internal quotation marks omitted).

In that light, the post-*Harper I* remedial Act and its "trigger provisio[n]" plainly can make no difference to our jurisdiction or lack thereof. *Ante*, at 16. When passed, that Act was essentially a change in the State's conduct under judicial

_____

majority cites had nothing to do with North Carolina's congressional plan. Instead, it considered whether two state-constitutional provisions, which require that *state-legislature* districting plans "remain unaltered" until the next census after they have become "established," N. C. Const., Art. II, §§ 3(4) and 5(4), prevented the Assembly from revising the 2021 state plans that *Harper I* had rejected. See *Harper III*, 384 N. C., at 374–378, 886 S. E. 2d, at 446–448. In determining that the 2021 state plans were never "established," *Harper III* did not mean that *Harper I* somehow still restrains those plans; rather, it indicated that those plans *themselves* do not restrain the Assembly going forward. Absolutely nothing in *Harper III* suggests that the North Carolina Supreme Court's judgments act directly upon legislative enactments—"striking them down" today and "reinstating" them tomorrow—or that the 2021 congressional map remains subject to any restraint left over from *Harper I*.

constraint (the result of *Harper I*), but with the declared
intention of resuming the original conduct if that constraint
were removed. That declaration kept the controversy alive
while the constraint still existed, as in *Hunt* v. *Cromartie*,
526 U. S. 541, 545, n. 1 (1999). But, after *Harper III*, there
is no more constraint in this case. *Harper I* has been over-
ruled, and plaintiffs-respondents' claims have been dismissed
in a final judgment. Nothing about this case prevents the
State from either enacting or implementing any districting
plan. If "the presently operative statutes of North Caro-
lina" need to be "alter[ed]," that is the General Assembly's
job, not ours. *Ante*, at 15 (internal quotation marks omit-
ted). Regardless, petitioners have fully prevailed in this
case, and plaintiffs-respondents have not obtained any en-
forceable relief that could affect the conduct of future
elections.

Indeed, to the extent the trigger provision adds anything
to the majority's analysis, it only underscores the absence of
a justiciable case or controversy.[6] A state legislature is free
to condition the effectiveness of a change in state law on
external events, including this Court's actions in cases prop-
erly before it. But, as should be obvious, such a trigger
provision cannot be the entire basis of an Article III case or

---

[6] I assume here that the majority is reading the provision correctly,
though it is far from clear that this is actually the case. As relevant, the
provision stated that the remedial redistricting plan "is effective contin-
gent upon its approval or adoption by the [trial court]," "unless the United
States Supreme Court or any other federal court reverses or stays
[*Harper I*] (or [*Harper I*] is otherwise enjoined, made inoperable, or inef-
fective), and in such case [the 2021 Act] is again effective." 2022 N. C.
Sess. Laws 3, p. 10, §2. The majority's reading is based on three supposi-
tions that it does not justify. The first is that this provision has any refer-
ence at all to events after the 2022 elections, to which the remedial Act
was exclusively directed. The second is that the dependent clause follow-
ing "unless" is applicable even though, under the main clause, the remedial
plan was never "adopt[ed]" by the trial court and thus never became "ef-
fective." The third is that *Harper III* did not "otherwise . . . ma[ke]"
*Harper I* "inoperable, or ineffective."

controversy. Where, as here, the Court cannot affect the adjudicated rights and liabilities of the parties in the case below, a state legislature cannot manufacture a justiciable controversy by providing that state law will change in some way depending on how this Court answers a moot question. That would simply be a roundabout way of asking this Court to render an advisory opinion. But "federal courts cannot give answers simply because someone asks." *Uzuegbunam*, 592 U. S., at —— (ROBERTS, C. J., dissenting). That is true when the request comes from Congress, see *Muskrat* v. *United States*, 219 U. S. 346, 360–361 (1911), and it is equally true when the request comes from a state legislature.[7]

In sum, there is no issue before this Court that can affect the judgment in this action. As such, the question presented is moot, and the writ of certiorari should be dismissed.

## II

I would gladly stop there. The majority's views on the merits of petitioners' moot Elections Clause defense are of far less consequence than its mistaken belief that Article III authorizes any merits conclusion in this case, and I do not wish to belabor a question that we have no jurisdiction to

---

[7] The idea of deciding an issue to determine whether a statute shall be effective is not unprecedented, but the precedents do not aid the majority. At times, state legislatures have enacted laws contingent on state-court opinions approving their constitutionality—in fact, such legislation produced the first two opinions addressing the Elections Clause question here (which both reached the opposite conclusion from today's majority). See Act No. 5, 1863 Vt. Acts & Resolves p. 7, approved, *Opinion of Judges*, 37 Vt. 665 (1864); 1864 N. H. Laws p. 3061, approved, *In re Opinions of Justices*, 45 N. H. 595 (1864); see also *In re Plurality Elections*, 15 R. I. 617, 8 A. 881 (1887) (similar situation and conclusion). Those opinions have always been understood as "advisory opinions." See, *e. g.*, *In re Constitutionality of House Bill 88*, 115 Vt. 524, 528–529, 64 A. 2d 169, 171–172 (1949); *Goodell* v. *Judith Basin County*, 70 Mont. 222, 231, 224 P. 1110, 1112 (1924). Such advisory opinions may be authorized by some state constitutions, but Article III gives this Court no such power.

decide. Nonetheless, I do not find the majority's merits reasoning persuasive.

The Elections Clause of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Art. I, §4, cl. 1. The question presented was whether the people of a State can place state-constitutional limits on the times, places, and manner of holding congressional elections that "the Legislature" of the State has the power to prescribe. Petitioners said no. Their position rests on three premises, from which the conclusion follows.

The first premise is that "the people of a single State" lack any ability to limit powers "given by the people of the United States" as a whole. *McCulloch* v. *Maryland*, 4 Wheat. 316, 429 (1819). This idea should be uncontroversial, as it is "the unavoidable consequence of th[e] supremacy" of the Federal Constitution and laws. *Id.*, at 436. As the Court once put it (in a case about the Article V ratifying power of state legislatures), "a federal function derived from the Federal Constitution . . . transcends any limitations sought to be imposed by the people of a State." *Leser* v. *Garnett*, 258 U. S. 130, 137 (1922).

The second premise is that regulating the times, places, and manner of congressional elections "'is no original prerogative of state power,'" so that "such power 'had to be delegated to, rather than reserved by, the States.'" *Cook* v. *Gralike*, 531 U. S. 510, 522 (2001) (first quoting 1 J. Story, Commentaries on the Constitution of the United States §627 (3d ed. 1858) (Story); then quoting *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 804 (1995)). This premise is firmly supported by this Court's precedents, which have also held that the Elections Clause is "the exclusive delegation of"

such power, as "[n]o other constitutional provision gives the States authority over congressional elections." *Cook*, 531 U. S., at 522–523; see also *United States* v. *Classic*, 313 U. S. 299, 315 (1941) ("While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by [the Elections Clause]" (citations omitted)).

The third premise is that "the Legislature thereof" does not mean the people of the State or the State as an undifferentiated body politic, but, rather, the lawmaking power as it exists under the State Constitution. This premise comports with the usual constitutional meanings of the words "State" and "Legislature," as well as this Court's precedents. "A state, and the legislature of a state, are quite different political beings." Story § 628. "A state, in the ordinary sense of the Constitution, is a political community of free citizens . . . organized under a government sanctioned and limited by a written constitution." *Texas* v. *White*, 7 Wall. 700, 721 (1869). "'Legislature,'" on the other hand, generally means "'the representative body which ma[kes] the laws of the people.'" *Smiley* v. *Holm*, 285 U. S. 355, 365 (1932) (quoting *Hawke* v. *Smith*, 253 U. S. 221, 227 (1920)).

To be sure, the precise constitutional significance of the word "Legislature" depends on "the function to be performed" under the provision in question. *Smiley*, 285 U. S., at 365. Because "the function contemplated by" the Elections Clause "is that of making laws," *id.*, at 366, this Court's Elections Clause cases have consistently looked to a State's written constitution to determine the constitutional actors in whom lawmaking power is vested. See *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. 787, 795–796, 814 (2015); *Smiley*, 285 U. S., at 363; *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565, 566–568

(1916).[8]   The definitions that most precisely explain this
Court's holdings were given in a state-court case that antici-
pated *Hildebrant* and *Smiley* by several years: "[T]he word
'Legislature,' as used in [the Elections Clause] means the
lawmaking body or power of the state, as established by the
state Constitution," or, put differently, "that body of persons
within a state clothed with authority to make the laws."
*State ex rel. Schrader* v. *Polley*, 26 S. D. 5, 10–11, 127 N. W.
848, 850–851 (1910).

If these premises hold, then petitioners' conclusion follows:
In prescribing the times, places, and manner of congressional
elections, "the lawmaking body or power of the state, as es-
tablished by the state Constitution," *id.*, at 10, 127 N. W., at
850, performs "a federal function derived from the Federal
Constitution," which thus "transcends any limitations sought
to be imposed by the people of a State," *Leser*, 258 U. S., at
137.    As shown, each premise is easily supported and con-
sistent with this Court's precedents.    Petitioners' conclusion

---

[8] The only complications with this approach have arisen where a State
Constitution did not vest the legislative power wholly in a single repre-
sentative body, as the Federal Constitution appears to presuppose.    Thus,
in *Hildebrant*, the Court rejected as nonjusticiable an argument "that to
include the referendum within state legislative power for the purpose of
apportionment" was "repugnant to" the Elections Clause.    241 U. S., at
569.    Somewhat similarly, in *Arizona State Legislature*, the Court faced
a State Constitution "in which the people of a State exercise legislative
power coextensive with the authority of an institutional legislature," 576
U. S., at 819, with the majority "see[ing] no constitutional barrier to a
State's empowerment of its people by embracing that form of lawmaking,"
*id.*, at 808–809.    As relevant to identifying the State's "Legislature," the
majority opinion emphasized that Arizona's written Constitution "'estab-
lishes the electorate of Arizona as a coordinate source of legislation' on
equal footing with the representative legislative body," *id.*, at 795 (alter-
ation omitted), and thus held that "lawmaking power in Arizona includes
the initiative process," *id.*, at 793; see also *id.*, at 814.    No such complica-
tions exist in North Carolina, where the State Constitution simply pro-
vides that "[t]he legislative power of the State shall be vested in the Gen-
eral Assembly."    Art. II, §1.

also mirrors the Court's interpretation of parallel language in the Electors Clause[9] in *McPherson* v. *Blacker*, 146 U. S. 1 (1892): "[T]he words, 'in such manner as the legislature thereof may direct,'" "operat[e] as a limitation upon the State in respect of any attempt to circumscribe the legislative power." *Id.*, at 25.[10]

The majority rejects petitioners' conclusion, but seemingly without rejecting any of the premises from which that conclusion follows. Its apparent rationale—that *Hildebrant*, *Smiley*, and *Arizona State Legislature* have already foreclosed petitioners' argument—is untenable, as it requires disregarding a principled distinction between the issues in those cases and the question presented here. In those cases, the relevant state-constitutional provisions addressed the allocation of lawmaking power within each State; they defined what acts, performed by which constitutional actors, constituted an "exercise of the lawmaking power." *Smiley*, 285 U. S., at 364; cf. U. S. Const., Art. I, § 7, cl. 2 (describing the processes upon completion of which a bill "become[s] a Law"). In other words, those cases addressed how to identify "the Legislature" of each State. But, nothing in their holdings speaks at all to whether the people of a State can impose substantive limits on the times, places, and manner that a procedurally complete exercise of the lawmaking power may validly prescribe. These are simply different questions: "There is a difference between *how* and *what*." J. Kirby, Limitations on the Power of State Legislatures

---

[9] The Electors Clause provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for the election of the President and Vice President. Art. II, § 1, cl. 2.

[10] Contrary to the majority's suggestion of ambiguity, see *ante*, at 27–28, this statement can only have meant that the state legislature's power to direct the manner of appointing electors may not be limited by the state constitution. No other "limitation upon the State" is possible, for, as the *McPherson* Court said just a few sentences earlier, "the constitution of the State" is the only "authority" that ordinarily "limit[s]" "[t]he legislative power." 146 U. S., at 25.

Over Presidential Elections, 27 Law & Contemp. Prob. 495, 503 (1962).

This is not an arbitrary distinction, but one rooted in the logic of petitioners' argument. No one here contends that the Elections Clause *creates* state legislatures or defines "the legislative process" in any State. *Smiley*, 285 U. S., at 369. Thus, while the Elections Clause confers a lawmaking power, "the exercise of th[at] authority must" follow "the method which the State has prescribed for legislative enactments." *Id.*, at 367. But, if the power in question is not original to the people of each State and is conferred upon the constituted legislature of the State, then it follows that the people of the State may not dictate what laws can be enacted under that power—precisely as they may not dictate what constitutional amendments their legislatures can ratify under Article V. See *Leser*, 258 U. S., at 137.[11] Accordingly, if petitioners' premises hold, then state constitutions may specify *who* constitute "the Legislature" and prescribe *how* legislative power is exercised, but they cannot control *what* substantive laws can be made for federal elections.

The majority indicates that it does not perceive this distinction between "substantive" and "procedural" rules, see *ante*, at 30–32,[12] illustrating its doubts with a rhetorical ques-

_____

[11] The majority states that *Smiley* "already distinguished" *Leser* as involving a nonlawmaking function. *Ante*, at 28. But *Smiley* distinguished the "electoral," "ratifying," and "consenting" functions of state legislatures from their "lawmaking" function under the Elections Clause, 285 U. S., at 365–366, only to explain why the last function must be "exercise[d] . . . in accordance with the [State's] method . . . for legislative enactments," *id.*, at 367, including "the participation of the Governor wherever the state constitution provided for such participation as part of the process of making laws," *id.*, at 370. Nothing in *Smiley* even hints that a federally delegated power fails to "transcen[d] limitations sought to be imposed by the people of a State" simply because it is a lawmaking function. *Leser*, 258 U. S., at 137.

[12] This admission carries troubling implications for other fields, as comparable "distinction[s] between procedure and substance [are] not unknown in the law." *United States* v. *Kras*, 409 U. S. 434, 463, n. 6 (1973)

Thomas, J., dissenting

tion: "When a governor vetoes a bill because of a disagreement with its policy consequences, has the governor exercised a procedural or substantive restraint on lawmaking?" *Ante*, at 31–32. The answer is straightforward: The power of approving or vetoing bills is "a part of the legislative process" because it is "a part in the making of state laws." *Smiley*, 285 U. S., at 368–369; see also *INS* v. *Chadha*, 462 U. S. 919, 933, 951, 954, 957, n. 22, 958 (1983) (repeatedly referring to bicameralism and presentment as the "procedure" or "procedures" of lawmaking). A Governor's *motives* for vetoing a certain bill are irrelevant to the effect of the veto as part of the legislative process, just as the motives that may lead one house of the legislature to reject a bill passed by the other house are irrelevant to the effect of its doing so. Put simply, when this power is conferred on the Governor of a State, it "makes him in effect a third branch *of the legislature*." T. Cooley, General Principles of Constitutional Law 50 (1880) (emphasis added); accord, *Arizona State Legislature*, 576 U. S., at 833 (Roberts, C. J., dissenting) (noting that "approving [and] vetoing bills" are "legislative functions"); *Chadha*, 462 U. S., at 947 (explaining that "lawmaking" is "a power . . . shared by both Houses and the President"); *La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423, 453 (1899) (noting that Presidential approval "is legislative in its nature"); cf. 1 W. Blackstone, Commentaries on the

--------

(Marshall, J., dissenting). For example, our habeas corpus jurisprudence has long distinguished "substantive" constitutional rules from "procedural" ones. *Schriro* v. *Summerlin*, 542 U. S. 348, 352, 353 (2004). Our sentencing appellate review jurisprudence similarly recognizes a distinction between the "procedura[l] sound[ness]" of a sentencing decision and "the substantive reasonableness of the sentence imposed." *Gall* v. *United States*, 552 U. S. 38, 51 (2007). And, no less essential a statute than the Rules Enabling Act presupposes a meaningful distinction between "rules of practice and procedure" and matters of "substantive right." 28 U. S. C. §§ 2072(a) and (b). Indeed, the constitutionality of the Act rests upon this very distinction. See *Hanna* v. *Plumer*, 380 U. S. 460, 470–472 (1965); *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 9–10 (1941).

Laws of England 150 (1765) ("[T]he king is himself a part of the parliament"). This is a question of *who*, not *what*, and thus is "a matter of state polity" as far as the Elections Clause is concerned. *Smiley*, 285 U. S., at 368.

But *substantive* constraints on what the lawmaking power can do (gubernatorial approval included) demand an entirely different justification—one that the majority never provides. It does not overrule *Cook* and *Thornton* to hold that the power to prescribe times, places, and manner for congressional elections is an original power of the people of each State. Nor does it hold that the people are themselves "the Legislature" to which the Federal Constitution delegates that power. See *ante*, at 25–26. Indeed, the majority devotes little attention to the source and recipient of the power described in the Elections Clause, notwithstanding their direct relevance to the question presented.

Instead, the majority focuses on the power of state courts to exercise "judicial review" of Elections Clause legislation. See *ante*, at 19–22, 34–37. But that power sheds no light on the question presented. In every case properly before it, any court—state or federal—must ascertain and apply the substantive law that properly governs that case. Thus, the court naturally must apply the Federal Constitution rather than any statute in conflict with it. The court must also apply the state constitution over any conflicting statute enacted under a power limited by that constitution. Petitioners' argument, however, is that legislation about the times, places, and manner of congressional elections is *not* limited by state constitutions—because the power to regulate those subjects comes from the Federal Constitution, not the people of the State. Right or wrong, this question has nothing to do with whether state courts have the power to conduct judicial review in the first place. To say that "state judicial review" authorizes applying state constitutions over conflicting Elections Clause legislation, *ante*, at 22, is simply to assume away petitioners' argument.

## III

The majority opinion ends with some general advice to state and lower federal courts on how to exercise "judicial review" "in cases implicating the Elections Clause." *Ante*, at 36. As the majority offers no clear rationale for its interpretation of the Clause, it is impossible to be sure what the consequences of that interpretation will be. However, judging from the majority's brief sketch of the regime it envisions, I worry that today's opinion portends serious troubles ahead for the Judiciary.

The majority uses the separate writings in *Bush* v. *Gore*, 531 U. S. 98 (2000) (*per curiam*), as a loose touchstone for the kind of judicial review that it apparently expects federal courts to conduct in future cases like this one. On its face, this is an awkward analogy, for there is a significant difference between *Bush* and *Harper I*. In *Bush*, the state court's judgment was based on an interpretation of state statutory law, enacted by the state legislature. Thus, the relevant Electors Clause question was whether, in doing so, the state court had departed from "the clearly expressed intent of the legislature," 531 U. S., at 120 (Rehnquist, C. J., concurring), "impermissibly distort[ing]" the legislature's enactments "beyond what a fair reading required," *id.*, at 115. In *Harper I*, by contrast, there was no doubt that the state court departed from the clearly expressed intent of the legislature; it rejected the legislature's enactment as unconstitutional.

By doing so, today's majority concludes, *Harper I* did not commit *per se* error, as the Elections Clause permits state courts to apply substantive state-constitutional provisions to the times, places, and manner of federal elections. At the same time, state courts are warned that they operate under federal-court supervision, lest they "transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections." *Ante*, at 36. Thus, under the majority's

framework, it seems clear that the statutory-interpretation review forecast in *Bush* (or some version of it) is to be extended to state *constitutional* law.

In this way, the majority opens a new field for *Bush*-style controversies over state election law—and a far more uncertain one. Though some state constitutions are more "proli[x]" than the Federal Constitution, it is still a general feature of constitutional text that "only its great outlines should be marked." *McCulloch*, 4 Wheat., at 407. When "it is a *constitution* [courts] are expounding," *ibid.*, not a detailed statutory scheme, the standards to judge the fairness of a given interpretation are typically fewer and less definite.

Nonetheless, the majority's framework appears to demand that federal courts develop some generalized concept of "the bounds of ordinary judicial review," *ante*, at 36; apply it to the task of constitutional interpretation within each State; and make that concept their rule of decision in some of the most politically acrimonious and fast-moving cases that come before them. In many cases, it is difficult to imagine what this inquiry could mean in theory, let alone practice. For example, suppose that we were reviewing *Harper I* under this framework. Perhaps we could have determined that reading justiciable prohibitions against partisan gerrymandering into the North Carolina Constitution exceeded the bounds of ordinary judicial review in North Carolina; perhaps not. If not, then, in order to ensure that *Harper I* had not "arrogate[d]" the power of regulating federal elections, *ante*, at 36, we would presumably have needed to ask next whether it exceeded the bounds of ordinary judicial review in North Carolina to find that the specific congressional map *here* violated those prohibitions. After all, in constitutional judgments of this kind, it can be difficult to separate the rule from the fact pattern to which the rule is applied. We have held, however, that federal courts are not equipped to judge partisan-gerrymandering questions *at all*. *Rucho* v. *Common Cause*, 588 U. S. ——, —— (2019). It would seem to fol-

low, *a fortiori*, that they are not equipped to judge whether a state court's partisan-gerrymandering determination surpassed "the bounds of ordinary judicial review."

Even in cases that do not involve a justiciability mismatch, the majority's advice invites questions of the most far-reaching scope. What *are* "the bounds of ordinary judicial review"? What methods of constitutional interpretation do they allow? Do those methods vary from State to State? And what about *stare decisis*—are federal courts to review state courts' treatment of their own precedents for some sort of abuse of discretion? The majority's framework would seem to require answers to all of these questions and more.

In the end, I fear that this framework will have the effect of investing potentially large swaths of state constitutional law with the character of a federal question not amenable to meaningful or principled adjudication by federal courts. In most cases, it seems likely that "the bounds of ordinary judicial review" will be a forgiving standard in practice, and this federalization of state constitutions will serve mainly to swell federal-court dockets with state-constitutional questions to be quickly resolved with generic statements of deference to the state courts. On the other hand, there are bound to be exceptions. They will arise haphazardly, in the midst of quickly evolving, politically charged controversies, and the winners of federal elections may be decided by a federal court's expedited judgment that a state court exceeded "the bounds of ordinary judicial review" in construing the state constitution.

I would hesitate long before committing the Federal Judiciary to this uncertain path. And I certainly would not do so in an advisory opinion, in a moot case, where "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1869).

I respectfully dissent.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 21, line 1, "Mort." is changed to "Mart."
p. 50, line 16, "ma[p]" is changed to "pla[n]"
p. 65, line 18, the first instance of "the" is deleted